MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2025 ME 6
Docket:       BCD-23-122
Argued:       November 9, 2023
Decided:      January 28, 2025
Panel:        STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ., and
              HUMPHREY, A.R.J.[1]
Majority:     STANFILL, C.J., and MEAD, HORTON, and CONNORS, JJ., and HUMPHREY, A.R.J.
Dissent:      DOUGLAS and LAWRENCE, JJ.

ROBERT E. DUPUIS et al.

v.

ROMAN CATHOLIC BISHOP OF PORTLAND

CONNORS, J.

[¶1]  Robert E. Dupuis and twelve other plaintiffs filed lawsuits against the Roman Catholic Bishop of Portland, seeking damages for sexual abuse allegedly perpetrated by the Bishop's clergy when the plaintiffs were minor children.  Their claims were previously barred by the statute of limitations, and the Bishop moved for judgment on the pleadings in each of the suits, arguing that 14 M.R.S. § 752-C(3) (2022),[2] which purports to revive the plaintiffs'

---

[1]  Although not present at oral argument, Justice Humphrey participated in this appeal.  *See* M.R. App. P. 12(a)(2).  Although Justice Jabar participated in this appeal, he retired before this opinion was certified.

[2]  Title 14 M.R.S. § 752-C has since been amended, though the amendments are irrelevant in the present case.  *See* P.L. 2023, ch. 475, § 1 (effective Oct. 25, 2023) (codified at 14 M.R.S. § 752-C (2024)).

claims, deprives the Bishop of a constitutionally protected vested right. In orders entered in the Business and Consumer Docket, the court (*McKeon, J.*) denied the Bishop's motions but, pursuant to Maine Rule of Appellate Procedure 24(c), reported to us its thirteen separate, nearly identical orders denying the dispositive motions.

[¶2] We accept the report and hold that the retroactive application of section 752-C(3) contravenes centuries of our precedent and multiple provisions of the Maine Declaration of Rights as well as the Constitution's provisions regarding separation of powers.

## I. BACKGROUND

[¶3] From at least 1954 until 1985, the general limitations period for most civil claims was six years.[3] R.S. ch. 112, § 93 (1954); 14 M.R.S.A. § 752 (1985). In 1985, the Legislature enacted a separate six-year statute of limitations for claims based on sexual acts toward minors. P.L. 1985, ch. 343, § 1 (effective Sept. 19, 1985) (codified at 14 M.R.S.A. § 752-C (1985)). That statutory period was extended to twelve years in 1991. P.L. 1991, ch. 551, § 1

---

[3] At the time of the alleged abuse in this case, claims for assault or battery were subject to a two-year limitations period. R.S. ch. 112, § 93 (1954) ("Actions for assault and battery . . . shall be commenced within 2 years after the cause of action accrues.").

(effective Oct. 9, 1991).  The Legislature then eliminated the limitations period altogether in 2000.  P.L. 1999, ch. 639, § 1 (effective Aug. 11, 2000).

[¶4]  Importantly, both the 1991 extension and the 2000 elimination of the statutory period under section 752-C applied only to claims accruing after their effective date or those "not yet . . . barred by the previous statute of limitations in force" on that date.  P.L. 1991, ch. 551, § 2; P.L. 1999, ch. 639, § 2 (effective Aug. 11, 2000).  In 2021, however, the Legislature sought to revive these previously barred claims.  P.L. 2021, ch. 301, § 1 (effective Oct. 18, 2021) (codified at 14 M.R.S. § 752-C (2022)).  After the 2021 amendment, section 752-C provided as follows:

> **1.  No limitation**.  Actions based upon sexual acts toward minors may be commenced at any time.
>
> **2.  Sexual acts toward minors defined**.  As used in this section, 'sexual acts toward minors' means the following acts that are committed against or engaged in with a person under the age of majority:
>
>> A.  Sexual act, as defined in Title 17-A, section 251, subsection 1, paragraph C; or
>>
>> B.  Sexual contact, as defined in Title 17-A, section 251, subsection 1, paragraph D.
>
> **3.  Application**.  This section applies to all actions based upon sexual acts toward minors regardless of the date of the sexual act and regardless of whether the statute of limitations on such actions expired prior to the effective date of this subsection.

14 M.R.S. § 752-C.

[¶5]  In 2022, Dupuis filed a complaint in the Superior Court naming the Bishop as the sole defendant.  He alleged that in 1961, when he was twelve years old, a priest employed by the Bishop sexually assaulted him on multiple occasions.  His complaint asserted seven counts: negligent failure to warn, train, or educate (Count 1); breach of fiduciary duty (Count 2); fraudulent concealment (Count 3); negligent supervision (Count 4); sexual assault under a respondeat superior theory (Count 5); intentional infliction of emotional distress (Count 6); and punitive damages (Count 7).  The statute of limitations applicable to Dupuis's claims expired six years after he became an adult, long before the 1991, 2000, and 2021 amendments took effect.  *See* 14 M.R.S.A. § 853 (1976) (providing that the limitations period begins to run when a disability, like minority status, is removed).[4]

[¶6]  The case was transferred to the Business and Consumer Docket (BCD).  *See* M.R. Civ. P. 130(a)(3); M.R. Civ. P. 131.  The Bishop answered and moved for judgment on the pleadings under Maine Rule of Civil Procedure 12(c), arguing that Dupuis's claims were barred by the previously applicable

---

[4] Title 14 M.R.S. § 853 was originally codified in 1964, and this version of the statute remained in effect when Dupuis's claims accrued, though it was later amended several times in ways that do not affect this case.  *See* P.L. 1977, ch. 492, § 2 (effective Oct. 24, 1977); P.L. 1985, ch. 343, § 2 (effective Sept. 19, 1985); P.L. 2013, ch. 329, § 1 (effective Oct. 9, 2013).

statute of limitations because the 2021 amendment to section 752-C is unconstitutional. The court denied the Bishop's motion but agreed to report the matter to us under Maine Rule of Appellate Procedure 24(c).

[¶7] Pursuant to the court's report, Dupuis's case was transferred to us. On the same day, we received similar reports from the same court in twelve other cases involving similar plaintiffs and the same defendant. We consolidated these cases and, consistent with Maine Rule of Civil Procedure 24(d), permitted the State to intervene as an appellee. The parties then stipulated that "the thirteen matters on report are substantially similar" and, because Dupuis (unlike many of the other plaintiffs) agreed to the use of his name, that the record in his case would serve as the sole record on appeal. The parties stipulated that the identities of the other plaintiffs would remain confidential.

6

## II. DISCUSSION

**A.    We accept on report the question of whether the revival of expired claims provided in 14 M.R.S. § 752-C(3) is constitutional.**

[¶8]  Upon receipt of a report pursuant to Rule 24(c),[5] our first task is to determine whether to accept the report.  *See Despres v. Moyer*, 2003 ME 41, ¶ 14, 827 A.2d 61 (noting that we have discretion whether to accept or reject a report).  We independently weigh three factors when making this decision:

(1)  whether the question reported is of sufficient importance and doubt to outweigh the policy against piecemeal litigation;

(2)  whether the question might not have to be decided because of other possible dispositions; and

(3)  whether a decision on the issue would, in at least one alternative, dispose of the action.

*Littlebrook Airpark Condo. Ass'n v. Sweet Peas, LLC*, 2013 ME 89, ¶ 9, 81 A.3d 348 (quotation marks omitted).

[¶9]  In this instance, the court did not submit a specific question of law to us but instead asked us to consider its rulings on the Bishop's dispositive motions in the thirteen consolidated cases.  As we explained in *NECEC*

---

[5]  Maine Rule of Appellate Procedure 24(c) provides, in full:

If the trial court is of the opinion that a question of law involved in an interlocutory order or ruling made by it ought to be determined by the Law Court before any further proceedings are taken, it may on motion of the aggrieved party report the case to the Law Court for that purpose and stay all further proceedings except such as are necessary to preserve the rights of the parties without making any decision therein.

*Transmission LLC v. Bureau of Parks & Lands*, the lack of specific questions on report does not preclude us from acting. 2022 ME 48, ¶ 27, 281 A.3d 618. "It does, however, require us to define the scope of our review before we reach the merits." *Id.*

[¶10] We define the question presented as asking whether the retroactive application of the removal of a statute of limitations after a plaintiff's claim has been extinguished by a preexisting statute of limitations violates the Maine Constitution. This is a constitutional question of great importance, potentially disposes of at least thirteen cases currently pending in Maine courts, and will inevitably need to be answered, if not in any of these cases, then in other actions that will be brought.[6] We therefore accept the report.[7]

---

[6] Counsel represented to the trial court that, in addition to the thirteen cases before us here, there are eight similar cases pending in the Superior Court.

[7] The trial court's report could be read as seeking to pose a second question: whether 14 M.R.S. § 752-C(3) (2022) applies to institutional or organizational defendants. As we read the Bishop's argument in his motion for judgment on the pleadings, the Bishop was not contesting that the revival of expired claims authorized in the statute was meant, as a matter of statutory interpretation, to apply to institutional defendants like the diocese, but rather that the institutional nature of a defendant provides an additional basis to find a revival of a claim as to such a defendant violative of its constitutional rights. We need not and do not answer this question, given our ruling today that revival is not constitutionally permitted whether the defendant is an individual, an institution, an organization, or any other legal entity.

**B.      Under the Maine Constitution, once the statute of limitations has expired for a cause of action, the claim cannot be retroactively revived.**

      **1.      We have declared many times that a claim cannot be revived after the expiration of its statute of limitations**.

[¶11]   We apply a multi-factor test to construe our Constitution, examining text and structure, history and purpose, social understandings and values as reflected in statutes and the common law, economic and sociological considerations, and precedent from elsewhere to the extent we find it persuasive.  *See State v. Moore*, 2023 ME 18, ¶ 18, 290 A.3d 533; *State v. Norris*, 2023 ME 60, ¶ 34, 302 A.3d 1; *Winchester v. State*, 2023 ME 23, ¶ 14, 291 A.3d 707.[8]

[¶12]   Before embarking on this Maine-centric, multi-factor analysis, however, a threshold question asks whether our precedent has already addressed the issue presented.  In this case, it has.

---

[8] Under our "primacy" approach, we first examine our own precedent; our own common law; our own statutes and values; and our own sociological and economic context.  Only after that examination do we look to precedent from elsewhere to the extent that we find that precedent persuasive, weighing federal reasoning no more heavily than the reasoning applied in other state courts' decisions (and in this instance, *see infra* ¶¶ 37-44, federal case law is not a helpful interpretive guide for multiple reasons).  *See State v. Athayde*, 2022 ME 41, ¶¶ 20-21, 277 A.3d 387; *Winchester v. State*, 2023 ME 23, ¶ 14, 291 A.3d 707; *State v. Moore*, 2023 ME 18, ¶¶ 17-18, 290 A.3d 533; *State v. White*, 2022 ME 54, ¶ 31, 285 A.3d 262; *State v. Norris*, 2023 ME 60, ¶ 13, 302 A.3d 1; *State v. Reeves*, 2022 ME 10, ¶ 41, 268 A.3d 281; *State v. Rowe*, 480 A.2d 778, 781 (Me. 1984); *State v. Cadman*, 476 A.2d 1148, 1150 (Me. 1984); *State v. Larrivee*, 479 A.2d 347, 349 (Me. 1984); *State v. Flick*, 495 A.2d 339, 347 (Me. 1985).

[¶13]  In many decisions, we have declared that a cause of action cannot be revived after its statute of limitations has expired.  *E.g.*, *Atkinson v. Dunlap*, 50 Me. 111, 114 (1862) ("[T]he statute of limitations had forever barred its further interruption."); *Dobson v. Quinn Freight Lines, Inc.*, 415 A.2d 814, 816 (Me. 1980) ("No one has a vested right in the running of a statute of limitations until the prescribed time has completely run and barred the action."); *State v. L.V.I. Grp.*, 1997 ME 25, ¶ 11 n.4, 690 A.2d 960 ("Nor could the Legislature retroactively revive a similar cause of action against LVI on which the statute of limitations had run prior to the effective date of the amendment."); *Dahms v. Osteopathic Hosp. of Me.*, 2001 ME 145, ¶ 12, 782 A.2d 774 ("[A]n amendment to the statute of limitations cannot extend the life of a claim that has previously expired."); *Heber v. Lucerne-in-Maine Vill. Corp.*, 2000 ME 137, ¶ 11 n.3, 755 A.2d 1064 (citing *Dobson*, 415 A.2d at 816); *Morrissette v. Kimberly-Clark Corp.*, 2003 ME 138, ¶ 15, 837 A.2d 123 ("[A]mendments to the statute of limitations may be applied retroactively to extend the statute of limitations, but *not* to revive cases in which the statute of limitations has expired. . . . [E]xpiration of the statute of limitations . . . results in a final disposition of the case." (citations omitted)); *Angell v. Hallee*, 2014 ME 72, ¶ 6, 92 A.3d 1154 ("[C]hanges in a statute of limitations may extend the limitation period but cannot 'revive cases

in which the statute of limitations has expired.'" (quoting *Morrissette*, 2003 ME 138, ¶ 15, 837 A.2d 123)); *see also Lewis v. Webb*, 3 Me. 326, 336-37 (1825) (citing with approval case law providing that a legislature cannot revive a claim after the expiration of its statute of limitations); *White v. Jordan*, 27 Me. 370, 378-79 (1847) (noting that absent a new promise, an action to recover on a note would have been barred by the statute of limitations applicable prior to its repeal).

[¶14]  As noted, *see, e.g.*, Dissenting Opinion ¶ 59, these repeated declarations are technically dicta, i.e., "an assertion of law not necessary to the decision of the case." *Legault v. Levesque*, 150 Me. 192, 195, 107 A.2d 493, 496 (1954) (quotation marks omitted).  But they necessarily had to be dicta *because the Legislature has never before enacted a statute like section 752-C(3)* seeking to revive claims after their statute of limitations had expired.

[¶15]  A previous observation regarding the weight of a certain kind of dictum is apt here:

> Although these comments of the Justices in *Johnson's Case* may be dicta and, therefore, lack the controlling effect of judicial precedent, they express thoughts which are nonetheless enormously weighty as evidence of the content conveyed by the words of Article I, Section 6 of the Maine Constitution.  Because of the stature of the men who were speaking, their expertness and the timing of their words as practically contemporaneous with the adoption of the Constitution, we attribute to the remarks in

*Johnson's Case* an evidentiary cogency practically equivalent to that of statements made in debate by members of the Constitutional Convention speaking to support a proposed draft worded exactly in the language in which Article I, Section 6 was ultimately adopted.

*State v. Sklar*, 317 A.2d 160, 168 (Me. 1974).

[¶16]  So, too, here, as discussed below, *see infra* ¶¶ 25-29, 52, aside from the multiplicity of this precedent, our longstanding antipathy toward retroactive legislation of this type, first pronounced at the founding of our state, precludes dismissal of these repeated pronouncements as irrelevant musing.[9]

---

[9] The dissent also attempts to distinguish our precedent on various other grounds, such as the observations that these decisions relate to statutory claims, *e.g.*, to workers' compensation. Dissenting Opinion ¶¶ 139-41.  Although the dissent's observations are partially accurate, they are inapposite for several reasons.  First, not all relate to statutory claims.  *E.g.*, *Atkinson v. Dunlap*, 50 Me. 111, 113 (1862) (trespass); *Angell v. Hallee*, 2014 ME 72, ¶ 4, 92 A.3d 1154 (negligence, assault and battery, and other common law claims); *White v. Jordan*, 27 Me. 370, 379 (1847) (action to recover on a note).  Second, to the extent that one posits that there is a material difference between a statute of repose contained in a statute creating a cause of action and a statute of limitations, the precedent cited above refers expressly to "statutes of limitations."  *See supra* ¶ 13.  Third, there is no principled basis to distinguish a statute of repose from a statute of limitations in this context, as our use of the term "statute of limitations" in this precedent reflects.  *See Hart v. Massanari*, 266 F.3d 1155, 1172 (9th Cir. 2001) (discussing how precedent may be distinguished if there are factual differences "*material* to the application of the rule or allow the precedent to be distinguished on a *principled* basis") (emphasis added)).  None of these precedents hints at an application constrained by any of the features cited by the dissent.  The difference between a statute of limitations and a statute of repose is that the time within which an action must be commenced under a statute of limitations is based on the time a cause of action accrues, while a statute of repose limits the time within which an action may be brought unrelated to accrual.  54 C.J.S. *Limitations of Actions* § 6 (2024).  Both are designed to provide repose, *id.*, and the effect of the end of the statutory period is the same, which logically is what matters when determining whether a right vests.  *See Harkness v. Fitzgerald*, 1997 ME 207, ¶ 5, 701 A.2d 370 ("Statutes of limitation[s] are statutes of repose." (quotation marks omitted)).  Fourth, a statute of limitations is just that—a statute, too.  Finally, the distinction, as stated by the dissent—revival cannot occur when the statute of limitations is "embedded in a comprehensive statutory scheme," Dissenting Opinion ¶ 142, presents definitional difficulties: does this include or exclude claims that are based on a mix of statute and unabrogated common law? Does it include or exclude common law claims recognized at the time of injury but not as to the category of other individuals or organizations that subsequently, either through statutes or case law, expand who may be sued?  *See also infra* n.32.

12

[¶17]  In sum, we have declared flatly, many times, with no articulated restriction, in varied types of cases, both common law and statutorily created, that a claim cannot be revived after its statute of limitations has expired.[10]

### 2.  Constitutional text confirms that a claim cannot be revived after the expiration of its statute of limitations.

[¶18]  Because our precedent answers the question presented, we need go no further.  That said, applying our multi-factor test for interpreting our Constitution confirms the correctness of that precedent.

---

The dissent also cites other Maine decisions that it states support its position, *e.g.*, *Thayer v. Seavey*, 11 Me. 284, 289 (Me. 1834).  Dissenting Opinion ¶ 107.  None of these decisions provide that a claim may be revived after a statute of limitations has expired.  *Thayer* went to the issue of whether the Legislature could affect a plaintiff's ability to obtain a bill of costs, and we said that this was allowed because the Legislature may "modify *remedies* at its pleasure, in all the questions which have arisen respecting *appeals* and *costs*."  *Id.* at 290 (emphasis added).  We also suggested (as we held in other decisions) that the Legislature could not entirely eliminate a plaintiff's right of recovery through a change in a statute of limitations that did not give the plaintiff sufficient time to pursue his claim.  *Id.* This line of authority as to whether and how much the Legislature can shorten a statute of limitations period stands for the proposition that although remedies may be adjusted, the total elimination of an ability to seek a remedy destroys a right.  This principle supports the conclusion that the expiration of a statute of limitations vests the concomitant right of the defendant.  *See supra* ¶ 13; *infra* ¶ 17 & n.11.  Similarly, the dissent cites decisions that state that the Legislature can "'change the form'" of remedies if "'no vested rights are impaired or personal liabilities created.'"  Dissenting Opinion ¶ 128 (quoting *Thut v. Grant*, 281 A.2d 1, 6 (Me. 1971)).  Such decisions also support the majority position and are consistent with our declarations that a claim cannot be revived after the expiration of its statute of limitations: an attempted revival does not merely "change the form of remedies," it creates a new liability.  *See Thut*, 281 A.2d at 6-7 (quotation marks omitted).

[10]  Certainly, other courts read our case law as saying such.  *See Waller v. Pittsburgh Corning Corp.*, 742 F. Supp. 581, 583 (D. Kan. 1990), *aff'd*, 946 F.2d 1514 (10th Cir. 1991); *Johnson v. Garlock, Inc.*, 682 So. 2d 25, 28 (Ala. 1996); *Doe v. Hartford Roman Catholic Diocesan Corp.*, 119 A.3d 462, 510-11 (Conn. 2015); *State of Minn. ex rel. Hove v. Doese*, 501 N.W.2d 366, 369 (S.D. 1993); *Bd. of Educ. of Normal Sch. Dist. v. Blodgett*, 40 N.E. 1025, 1027 (Ill. 1895); *Moore v. State*, 43 N.J.L. 203, 207 (1881).

[¶19]   The first step in our test is to examine the constitutional text. Although the parties focus on article I, section 6-A, we examine our Constitution holistically.  *See Opinion of the Justices*, 2023 ME 34, ¶ 22, 295 A.3d 1212 (interpreting a section of the Maine Constitution and noting its harmony with other provisions); *Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, ¶ 27, 237 A.3d 882 (examining constitutional language in the context of the Maine Constitution as a whole); Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* 296 (1998) ("A textual analysis of the Bill of Rights can also illuminate patterns and thus cast light on the true spirit of the law as a whole."). It is particularly important to engage in a holistic review when addressing the constitutionality of the revival of expired claims because, as discussed below, the prohibition against such retroactive legislation runs as a theme throughout the Constitution's text.

[¶20]   The first set of provisions in the Constitution relevant to our understanding of its treatment of retroactive legislation is the set protecting "property"; "privileges"; and "private," "natural, inherent and unalienable"

14

"rights."  This set includes article I, section 1;[11] article I, section 6;[12] article I, section 6-A;[13] article I, section 11;[14] and article I, section 21.[15]

---

[11] Article I, section 1 provides: "Natural rights.  All people are born equally free and independent, and have certain natural, inherent and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness."  The concept that legislation cannot impair a right that has vested was viewed at the time of our founding as a natural right.  *See Dash v. Van Kleeck*, 7 Johns. 477, 505-06 (N.Y. Sup. Ct. 1811) ("[T]he principle we are considering [protecting vested rights from retroactive impairment] is now to be regarded as sacred.")  In *Proprietors of Kennebec Purchase v. Laboree*, 2 Me. 275, 289-90 (1823), discussed *infra* ¶¶ 25-26, relying on article I, section 1, we cited Chancellor Kent's opinion in *Dash* as "full of learning upon the subject now under consideration"); *see also generally* Steven G. Calabresi & Sofía M. Vickery, *On Liberty and the Fourteenth Amendment: The Original Understanding of the Lockean Natural Rights Guarantees*, 93 Tex. L. Rev. 1299 (2015) (surveying the application of article I, section 1 and similar provisions in other state constitutions, including citation of these provisions to condemn retroactivity).

[12] Article 1, section 6 provides in its relevant part: "The accused shall not be . . . deprived of life, liberty, property or privileges, but by judgment of that person's peers or the law of the land."  Although this provision references an "accused," we have consistently construed this provision to prevent deprivation except by "the law of the land" in a civil context as well.  *E.g.*, *Bennett v. Davis*, 37 A. 864, 865 (Me. 1897); *see also NECEC Transmission LLC v. Bureau of Parks & Lands*, 2022 ME 48, ¶ 42, 281 A.3d 618 (noting that prior to the enactment of article I, section 6-A, article I, section 1 and article I, section 6 "were proxies for due process protections of vested rights").  The "law of the land" reference in article I, section 6 does not mean only comporting with whatever legislation the Legislature has chosen to enact but also includes a substantive protection against legislation depriving someone of a vested right.  *See Adams v. Palmer*, 51 Me. 480, 490-91 (1863) (citing *Saco v. Wentworth*, 37 Me. 165, 171 (1853)); *see also Eames v. Savage*, 77 Me. 212, 222 (1885) (explaining that a statute cannot offend against "the established principles of private rights").

[13] Article I, section 6-A provides: "No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of that person's civil rights or be discriminated against in the exercise thereof."  This section was added in 1963 to make more explicit and reconfirm Maine's commitment to these constitutional protections.  *See State v. Dumont*, 507 A.2d 164, 169 (Me. 1986) (Glassman, J., dissenting) (stating that article I, section 6-A is a "second or repeat guarantee").  In labeling section 6-A a repeat guarantee, Justice Glassman cited the First Report of the 1963 Maine Constitutional Commission, which says, "the rights with which we are here concerned are so fundamental and so important that if there is a second or repeat guarantee, such underwriting of protection is, we believe, all to the good."  *Id.*; L.D. 33 at 2 (101st Legis. 1963); s*ee also* Samuel S. Silsby Jr., *Proceedings of the Second Constitutional Commission of Maine* 243 (1963) (Maine Constitutional Commission President Fred C. Scribner stating "the protection [proposed to be recited in section 6-A] did exist, but that the Commission thought it would be well for the Maine Constitution to sum up the policy of the State succinctly in one place").  When questioned whether article I, section 6-A went beyond the protections of the Fourteenth Amendment, Scribner "said that he thought that this was correct."  Samuel S. Silsby Jr., at 244.

[¶21]  A second concept running throughout the above-cited provisions is the requirement of general, equal, and fixed application of the law.  *See, e.g.*, Me. Const. art. I, § 1 ("equally free"); Me. Const. art. I, § 6-A ("equal protection"); *Lewis*, 3 Me. at 335-36 (citing Me. Const. art. I, § 1 for the "immoveable basis" in laws of "the great principle of constitutional equality").  General and equal application of the law is a subset of the broader concept guarding against arbitrary governmental action: laws must be general, fixed and certain.  *See Eames v. Savage*, 77 Me. 212, 220-21 (1885) (noting that due process means "equal and general laws, fixed and certain").

[¶22]  Finally, the separation of powers provisions in the Constitution define the scope of legislative power.  In Article III, our framers expressly provided that the powers of government are divided into three distinct departments and kept separate.  Because the separation of powers doctrine is made express in our Constitution, the doctrine is "much more rigorous" than

---

14  Article I, section 11 provides: "The Legislature shall pass no bill of attainder, ex post facto law, nor law impairing the obligation of contracts, and no attainder shall work corruption of blood nor forfeiture of estate."  Each of these prohibitions reflects an anti-retroactivity concept.  *See Finch v. State*, 1999 ME 108, ¶ 9, 736 A.2d 1043 (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) (bills of attainder, ex post facto and due process)); *Black v. Bureau of Parks & Lands*, 2022 ME 58, ¶¶ 46-47, 288 A.3d 346 (contract).

15  Article I, section 21 provides: "Private property shall not be taken for public uses without just compensation; nor unless the public exigencies require it."  Consistent with the other provisions noted above protecting rights, property, and privileges, the term "property" in article I, section 21, protects intangibles.  *E.g.*, *State v. Noyes*, 47 Me. 189, 206-07 (1859) (protecting a franchise right).

that presented in construing the Constitution of the United States. *Burr v. Dep't of Corr.*, 2020 ME 130, ¶ 20, 240 A.3d 371 (quotation marks omitted). Our constitutional text provides that the Legislature's role is to make "laws and regulations." Me. Const. art. IV, pt. 3, § 1.

[¶23] Legislation reviving claims that have expired under the statutes of limitations applicable at the time of the operative events was not deemed by the framers to be a "law" within the power of the Legislature to enact. *See Lewis*, 3 Me. at 333 ("A law is defined as 'a rule of civil conduct.' 1 *Bl. Com.* 44. Hence it must in its nature be general and *prospective.*" (emphasis added)); *Adams v. Palmer*, 51 Me. 480, 491 (1863) ("It is for the Legislature to prescribe laws *for the future.*" (emphasis added)); Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672, 1738 (2012) (discussing how the historic invalidation of legislation impairing vested rights was linked to separation of powers because acts by legislatures impairing such rights were not viewed as "laws"); *cf.* John Hart Ely, *Democracy and Distrust* 90 (1980) (noting provisions like ex post facto and bill of attainder clauses are separation of powers provisions, "enjoining the legislature to act prospectively and by general rule (just as the judiciary is implicitly enjoined by Article III [of

the United States Constitution] to act retrospectively and by specific decree)").[16]

[¶24] To paraphrase Alexander Hamilton, judicial review is critical to ensure that the Legislature in its policy-making role, adheres to enacting prospective, fixed, and equally applied "laws"; otherwise, the constitutional provisions protecting rights, privileges, and property would be rendered meaningless.[17]

---

[16] Chancellor Kent's decision in *Dash*, was based on separation of powers principles. 7 Johns. at 505-06; *see also* Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672, 1748-49 (2012); Simeon Nash, *The Constitutionality of Retrospective Laws*, 2 W.L.J. 170, 174 (1844) (attacking retroactive legislation as "a gross usurpation in most cases upon the judicial power"). Although the holding in *Dash* is not directly relevant in that there, the court held that the statute at issue could and would be read not to have retroactive impact, in so ruling, Kent made clear that to allow revival after a limitation period had expired would impair a "lawfully acquired right." *Dash*, 7 John. at 505-06.

[17] Federalist Paper 78 states in relevant part:

> The complete independence of the courts of justice is peculiarly essential in a limited Constitution. By a limited Constitution, I understand one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no ex-post-facto laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing.

The Federalist No. 78 (Alexander Hamilton); *see also* The Federalist No. 44 (James Madison) (noting that retroactive legislative interference with personal rights, such as bills of attainder, ex-post-facto laws, and laws impairing the obligation of contracts, are "contrary to the first principles of the social compact, and to every principle of sound legislation" and are prohibited expressly or "by the spirit and scope" of every existing state constitution); *State Bank v. Cooper*, 10 Tenn. 599, 603 (1831) ("[C]ertain limits to the exercise of legislative power have been recognized from the earliest times. It is a principle of the English common law, as old as the law itself, that a statute, even of the omnipotent Parliament of Great Britain, is not to have a retrospective effect. Why was it so considered by the English courts? . . . [B]ecause there are eternal principles of justice which no government has a right to disregard.").

[¶25]  This constitutional hostility to legislative efforts to retroactively impair rights, privileges, and/or property, viewing such efforts as beyond the Legislature's function, is reflected in the earliest of our case law.  In *Proprietors of Kennebec Purchase v. Laboree*, we held that a law changing the rules regarding disseisin could not apply retroactively because it would impair vested rights.  2 Me. 275, 294-95 (1823).[18]

[¶26]  In *Laboree*, we noted that, unlike some other state constitutions, the Maine Constitution did not contain a provision expressly prohibiting retroactive legislation.  Critically, however, we stated that this omission was of no moment:

> It is true that there is no *express* provision in our constitution, as there is in that of *New-Hampshire*, by which the legislature are prohibited from enacting retrospective laws; though upon examination, we apprehend *it will be found to contain certain provisions which were intended to be, and must be considered, as prohibitions*.  These will presently be noticed.

---

[18]  The *Laboree* decision rejecting retroactivity was our *Marbury v. Madison*, 5 U.S. 137 (1803)—the first decision in which we recognized our authority to review the constitutionality of statutes. Hugh G. E. MacMahon, *Progress, Stability, and the Struggle for Equality* 38 (2009).

*Laboree*, 2 Me. at 288-89 (emphasis in original and added).  The Court in *Laboree* then referenced article I, section 1; article I, section 21; and the separation of powers provision in article IV, part 3, section 1.  *Id.* at 290-291.[19]

[¶27]  Similarly, in *Lewis*, we held it a violation of the separation of powers and other constitutional provisions to enact a resolve granting a litigant the right to appeal a decree that had become final.  3 Me. at 332-33.  As noted above, in that decision, we stated that to constitute a proper exercise of legislative power, a law must, in its nature, be "general and prospective."  *Id.* at 333.  While the holding involved the revival of an individual cause of action after the expiration of a right to appeal, the reasoning of the Court relied on authority relating to the expiration of limitations periods and repugnancy to retroactive

---

[19]  Our citation of article I, section 1 in condemning retroactivity, married to the antipathy to retroactivity entrenched in the common law in 1820, *see infra* ¶¶ 30-33, triggers yet another provision in the Maine Constitution, article I, section 24, which provides, "The enumeration of certain rights shall not impair nor deny others retained by the people."  *See* Steven G. Calabresi & Sofía M. Vickery at 1370-72 (citing *Laboree*, 2 Me. at 275) (noting the symbiotic relationship between constitutional provisions like article I, sections 1 and 24 in protecting rights entrenched in the common law such as anti-retroactivity); *see generally* Anthony B. Sanders, *Baby Ninth Amendments and Unenumerated Individual Rights in State Constitutions Before the Civil War*, 68 Mercer L. Rev. 389, 407, 409-17, 438 (2017) (tracing the history of "Baby Ninth" provisions like Maine's article I, section 24 from the first adopted provisions in 1820 (Alabama and Maine) to 1860); *McCracken v. State*, 518 P.2d 85, 91 (Alaska 1974) (stating that rights protected under Alaska's Baby Ninth include rights "long established" and of "fundamental importance").

20

legislation as well as special legislation, with the two concepts recognized as related.[20]  *Id.* at 335-37.

[¶28]  Contrary to the dissent's position, Dissenting Opinion ¶ 115, our case law relating to article I, section 19[21] does not undermine but rather underscores these principles.  In *Godbout v. WLB Holding, Inc.*, 2010 ME 46, ¶¶ 6-7, 997 A.2d 92, and earlier decisions, we explained that this constitutional provision did not mean that there could be no statute of limitations; to the contrary, the constitutional test is access to the judicial process, so that when a statute of limitations has expired, that meaningful access has been rendered

---

[20]  "All public laws, from their very nature and effects, are to be considered as rules for future cases, prescribed for the benefit and regulation of the whole community.  Laws of this description are considered as the guardians of the life, safety and rights of each individual in society.  In these, each man has an interest, while they remain in force, and on all occasions he may rightfully claim their protection; and all have an equal right to make this claim, and enjoy this protection." *Lewis v. Webb*, 3 Me. 326, 335-36 (1825).

The dissent's attempt to distinguish *Lewis* on the ground that a judgment had been entered there ignores this language.  Dissenting Opinion ¶¶ 123, 125.  While the intrusion into the role of the judicial branch is more obvious once a judgment has been obtained, as noted in *Lewis*, law-making, the Legislature's role, is prospective, while retroactive enforcement of the law is the role of the judiciary.  *Id.* at 333, 335-36.  Prohibition of reviving claims for which the limitations period has expired respects the law extant at the time of the alleged offense; hence, such action not only falls within the bailiwick of the judicial function but *enforces* the law as enacted by the Legislature.

As one author noted, *Laboree* and *Lewis* "are masterly and magisterial expositions of the law that rank among the most important decisions in the history of Maine law."  Hugh G. E. MacMahon, *Progress, Stability, and the Struggle for Equality* 34 (2009).

[21]  Article I, section 19 of the Maine Constitution, known as the "open courts" provision, provides that "[e]very person, for an injury inflicted on the person or the person's reputation, property or immunities, shall have remedy by due course of law; and right and justice shall be administered freely and without sale, completely and without denial, promptly and without delay."

complete. In *Choroszy v. Tso*, when rejecting a claim under the open courts provision claiming that the statute of limitations was too short, we responded by citing a Nebraska decision for the proposition that a statute of repose "is a right which is as valuable to a defendant as the right to recover a judgment is to the plaintiff; the two are but different sides of the same coin. . . . These are substantive rights recognized by Nebraska law and protected by its constitution." 647 A.2d 803, 807 (Me. 1994) (quoting *Spilker v. City of Lincoln*, 469 N.W.2d 546, 548 (Neb. 1991)). Hence, *Choroszy* joins the long list of Maine decisions, concluding that freedom from liability after the expiration of a statute of limitations is a "substantive right[] protected by . . . [the] constitution." *Id.* (quotation marks omitted).

[¶29] In sum, as early as our founding and many times thereafter, we have interpreted our constitutional text to reject retrospective legislation impairing vested rights, which rights include the protection from revival of causes of action after their statutes of limitations have expired.[22]

---

[22] Our position is consistent with early decisions from Massachusetts, from which Maine sprung. *See Battles v. Fobes*, 36 Mass. (19 Pick.) 578, 578 (1836) ("The rights of the defendant were ascertained and fixed before this last statute passed, and he cannot thereby be deprived of them."); *Brigham v. Bigelow*, 53 Mass. (12 Met.) 268, 274 (1847) ("It has never been decided that a limitation created by statute could not be extended by statute, so as to postpone the time for commencing an action, by a general law, applicable to all cases, *when the suit was not already barred by lapse of time, and by force of the statute*" (emphasis added)); *Darling v. Wells*, 55 Mass. (1 Cush.) 508, 509-10 (1844) ("When the debt was contracted, the defendant had no vested right in the statute of limitations, which could only affect the remedy of the creditor, and had no operation *until the term of limitation had*

22

### 3. The common law and statutes confirm that claims cannot be revived after their statutes of limitations have expired.

[¶30] Contemporaneous common law principles can inform the meaning of constitutional provisions because many constitutional concepts originated in the common law. *See Atkins v. Adams*, 2023 ME 59, ¶ 20, 301 A.3d 802. Post-enactment common law and statutes can also illuminate timeless social understandings and values embedded in the Constitution.

[¶31] Long before the adoption of the Maine Constitution, the common law condemned the concept of retroactive liability. *See* Nathan S. Chapman & Michael W. McConnell at 1731-32 ("This prospectivity principle had deep roots in the common law. American courts routinely cited Coke, Bracton, Bacon,

---

*elapsed*." (emphasis added)); *Loring v. City of Bos.*, 78 Mass. (12 Gray) 209, 211 (1858) (holding statute extending time for applying for assessment for damages could not be construed retrospectively to revive a claim); *Bigelow v. Bemis*, 84 Mass. (2 Allen) 496, 497 (1861) (an action on contract, "It is well settled that it is competent for the legislature to change statutes prescribing a limitation to actions, and that the one in force at the time of suit brought is applicable to the cause of action. The only restriction on the exercise of this power is, that *the legislature cannot remove a bar or limitation which has already become complete*, and that no new limitation shall be made to take effect on existing claims, without allowing a reasonable time for parties to bring actions before their claims are absolutely barred by a new enactment." (emphasis added)); *Kinsman v. City of Cambridge*, 121 Mass. 558, 558 (1877) (holding that statute could not be construed as reviving a right of action barred before its passage).

Decisions from other jurisdictions contemporaneous with our early case law reflect the same position. *See, e.g., Naught v. ONeal*, 1 Ill. (Breese) 36, 36 (1820); *Thompson v. Killary*, 683 S.W.3d 641, 647-48 (Ky. 2024) (tracing Kentucky's longstanding anti-revival precedent to 1829); *Couch v. McKee*, 6 Ark. 484, 484 (1846) (citing *Davis v. Minor*, 2 Miss. (1 Howard) 183 (1835)); *McKinney v. Springer*, 8 Blackf. 506, 507 (Ind. 1847); *De Cordova v. City of Galveston*, 4 Tex. 470, 478 (1849); *Baldro v. Tolmie*, 1 Or. 176, 179 (1855); *Sprecher v. Wakeley*, 11 Wis. 432, 439 (1860); *Girdner v. Stephens*, 48 Tenn. (1 Heisk.) 280, 285-86 (1870); *Calhoun v. Kellogg*, 41 Ga. 231, 234-35 (1870); *Pridgeon v. Greathouse*, 1 Idaho 359, 360 (1871); *Thompson v. Read*, 41 Iowa 48, 50 (1875); *Ryder v. Wilson's Ex'rs*, 41 N.J.L. 9, 10 (Sup. Ct. 1879); *Whitehurst v. Dey*, 90 N.C. 542, 545-46 (1884).

Blackstone, and Mansfield for the proposition that laws must be prospective."

(footnotes omitted)); Edward Coke, *The Second Part of the Institutes of the Laws*

*of England* 292 (Rawlins, 6th ed. 1681) ("[I]t is a rule and law of parliament,

that regularly *nova conftitutio futuris formam imponere debet, non prœteritis* [a

new law ought to affect the future, not the past]."). Justice Kennedy wrote:

> In the words of Chancellor Kent: 'A retroactive statute would partake in its character of the mischiefs of an *ex post facto* law . . . ; and in every other case relating to contracts or property, it would be against every sound principle.' 1 [James] Kent, Commentaries on American Law *455 [(William Kent, 6th ed. 1848)]; *see also ibid.* (rule against retroactive application of statutes to be 'founded not only in English law, but on the principles of general jurisprudence'). Justice Story reached a similar conclusion: 'Retrospective laws are, indeed, generally unjust; and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact.' 2 [Joseph] Story, Commentaries on the Constitution § 1398 ([Melville M Bigelow,] 5th ed. 1891).

*E. Enters. v. Apfel*, 524 U.S. 498, 547 (1998) (Kennedy, J., concurring); *see also*

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*, 494 U.S. 827, 855 (1990) (Scalia, J.,

concurring) (stating that retroactive laws are "contrary to fundamental notions

of justice," as reflected from the time of the ancient Greeks, Romans, Bracton,

Kent, and Story); *Ogden v. Saunders*, 25 U.S. (12 Wheat.) 213, 331 (1827)

(Trimble, J., opinion) ("In my judgment, the language of the authors of the

Federalist proves that they, at least, understood, that the protection of personal

security, and of private rights, from the despotic and iniquitous operation of

retrospective legislation, was, itself, and alone, the grand principle intended to be established.").  The principle that a cause of action cannot be revived after the expiration of a statute of limitations because revival interferes with a vested right falls within this longstanding condemnation.  *See, e.g.*, *Naught v. ONeal*, 1 Ill. (Breese) 36, 36 (1820); *Girdner v. Stephens*, 48 Tenn. (1 Heisk.) 280, 285-86 (1870); *supra* n.22.

[¶32]  With regard to statutory developments, as noted above, section 752-C appears aberrant as the first time in over two hundred years that the Legislature has attempted to revive causes of action after their statutes of limitations had run.

[¶33]  In sum, our case law prohibiting the revival of claims after the expiration of their statute of limitations flows inexorably from the anti-retroactivity theme permeating our constitutional text, which in turn was forged from longstanding principles of common law.

4. **Precedent from the minority of other jurisdictions that allow revival after their statutes of limitations have expired is not persuasive.**

[¶34]  In terms of sheer numbers, at the time of the adoption of our Constitution and for a lengthy period thereafter, the great majority of jurisdictions precluded the revival of claims after their statutes of limitations

had expired.[23]  After the Supreme Court's decision in *Campbell v. Holt*, 115 U.S. 620, 628-29 (1885), in which the majority held that revival was permitted, some courts deviated from this position.  If one includes jurisdictions with constitutions that contain express anti-retroactivity provisions—which we should, given our reasoning in *Laboree*, 2 Me. at 293-95—then, despite the Supreme Court's view, the majority of state courts of last resort continue to adhere to the view that revival is precluded.[24]

[¶35]  One cannot argue that the modern trend lies in one camp or the other.  Recent decisions include those finding revival permitted, *e.g.*, *A.B. v. S.U.*,

---

[23]  "In almost all of the states of the Union in which the question has arisen, it has been held that the right to set up the bar of a statute of limitations as a defense to a cause of action, after the statute has run, is a vested right, and cannot be taken away by legislation, either by a repeal of the statute without a saving clause, or by an affirmative act, and that it is immaterial whether the action is for the recovery of real or personal property, or for the recovery of a money demand, or for the recovery of damages for a tort." *Blodgett*, 40 N.E. at 1027.

[24]  *See Johnson*, 682 So. 2d at 28 ("The weight of American authority holds that the bar does create a vested right in the defense."); *Johnson v. Lilly*, 823 S.W.2d 883, 885 (Ark. 1992) (the "majority" of state jurisdictions); *Doe v. Roman Cath. Diocese*, 862 S.W.2d 338, 341 & n.7 (Mo. 1993) (citing decisions and stating that the majority of jurisdictions with a similar constitutional provision conclude that when "the original statute of limitation expires and bars the plaintiff's action, the defendant has acquired a vested right to be free from suit"); *Kelly v. Marcantonio*, 678 A.2d 873, 883 (R.I. 1996) ("the great preponderance" of state jurisdictions have rejected the general federal rule); *Hove*, 501 N.W.2d at 369 ("Most state courts addressing the issue of the retroactivity of statutes have held that legislation which attempts to revive claims which have been previously time-barred impermissibly interferes with vested rights of the defendant, and thus violates due process.").

Trying to calculate the number of jurisdictions falling into each camp is a chimera because the number depends on how one categorizes the case law.  For example, the dissent excludes relevant decisions from jurisdictions with express anti-retroactivity clauses in their constitutions, despite the fact that we said this was immaterial in *Laboree*, 2 Me. at 290, citing, inter alia, article I, section 1 of the Maine Constitution.  The dissent is also silent as to whether it recognizes a potential "hardship" exception; assuming not, the size of the category into which the reasoning of the dissent falls shrinks. *See infra* n.37 (discussing the federal hardship exception).

298 A.3d 573 (Vt. 2023), and those adhering to prohibition, *e.g.*, *Aurora Pub. Schs. v. A.S.*, 531 P.3d 1036 (Colo. 2023); *Thompson v. Killary*, 683 S.W.3d 641 (Ky. 2024); *Mitchell v. Roberts*, 469 P.3d 901 (Utah 2020).

[¶36]  Jurisdictions that allow revival do so based on one of two lines of reasoning: (a) they conclude that revival does not impair a "right" but only a "remedy"; or (b) they reject the concept of unassailable rights once vested, replacing it with a balancing approach.  Neither of these lines of authority is persuasive.

> **a.  The Supreme Court's "right-remedy" approach, set forth in *Campbell*, is not persuasive because it fails to acknowledge the impact of the revival of an expired claim.[25]**

[¶37]  In *Campbell*, the majority concluded that revival is permitted because it characterized a statute of limitations as relating only to a remedy, not

---

[25]  The dissent's argument (that we should look to federal precedent because the language of our Constitution "closely mirrors" that contained in the Fourteenth Amendment), Dissenting Opinion ¶ 88, suffers from multiple infirmities.  First, our language does not mirror that contained in the United States Constitution.  As discussed above, we have at least three constitutional provisions reflecting due process concepts with varying language—article I, sections 1, 6, and 6-A—along with express separation of powers provisions, unlike the U.S. Constitution.  Second, the Fourteenth Amendment was adopted in 1868, while our Declaration of Rights was adopted in 1820 and as discussed above, we have a rich history of precedents issued prior to 1868 construing our own due process clauses.  Third, as noted above, *see supra* n.13, focusing on article I, section 6-A of the Maine Constitution and its legislative history (enacted after 1868) shows that it was intended to be more protective than its federal counterpart.  Fourth, we have issued decisions confirming that our Constitution is more protective than the U.S. Constitution in the due process arena.  *E.g.*, *State v. Collins*, 297 A.2d 620, 626-27 (Me. 1972); *State v. Hunt*, 2016 ME 172, ¶ 17 & n.4, 151 A.3d 911; *State v. Caouette*, 446 A.2d 1120, 1122 (Me. 1982); *State v. Rees*, 2000 ME 55, ¶ 3, 748 A.2d 976.  Finally, as discussed below, *see infra* ¶ 51, identifying the Supreme Court's current position on retroactivity, including as to statutes of limitations, is a challenge.

a right that can vest.  115 U.S. at 624-630.  The fundamental problem with this position is that it ignores reality.[26]

[¶38]   In the words of Justice Bradley, joined by the Great Dissenter, Justice Harlan:[27]

> [A]n exemption from a demand, or an immunity from prosecution in a suit, is as valuable to the one party as the right to the demand or to prosecute the suit is to the other.  The two things are correlative, and to say that the one is protected by constitutional guaranties and that the other is not seems to me almost an absurdity.  One right is as valuable as the other.  My property is as much imperiled by an action against me for money as it is by an action against me for my land or my goods.  It may involve and sweep away all that I have in the world.  Is not a right of defense to such an action of the greatest value to me? . . .
>
> . . . The fact that this defense pertains to the remedy does not alter the case.  Remedies are the life of rights, and are equally protected by the constitution.  Deprivation of a remedy is equivalent to a deprivation of the right which it is intended to vindicate, unless another remedy exists or is substituted for that which is taken away.  The court has frequently held that to deprive a man of a remedy for enforcing a contract is itself a mode of impairing the validity of the contract.  And, as before said, the right of defense is just as valuable as the right of action.  It is the defendant's remedy.  There is really no difference between the one right and the other in this respect.

---

[26]  The distinction is also contrary to earlier Supreme Court precedent.  *E.g.*, *Edwards v. Kearzey*, 96 U.S. 595, 600 (1878) ("The ideas of right and remedy are inseparable.  Want of right and want of remedy are the same thing." (quotation marks omitted)).

[27]  *See* Peter S. Canellos, *The Great Dissenter: The Story of John Marshall Harlan, America's Judicial Hero* 256-70, 329-51 (2021) (discussing Justice Harlan's dissents in the Court's post-Reconstruction case law, such as in *Plessy v. Ferguson*, 163 U.S. 537 (1896), *overruled by Brown v. Bd. of Educ.*, 347 U.S. 483 (1954)).

*Campbell,* 115 U.S. at 630-31 (Bradley, J., dissenting).

[¶39]  As one court stated more concisely: "A bar created by the statute of limitations is as effectual as a payment." *Couch v. McKee*, 6 Ark. 484, 495 (1846); *see also Davis v. Minor*, 2 Miss. (1 Howard) 183, 189 (1835).[28]

[¶40]   Justice Oliver Wendell Holmes Jr. noted the illogic of a right-remedy distinction:

> In *Campbell v. Holt* . . . in which it was held by a majority of the court
> that a repeal of the statute of limitations as to debts already barred
> violated no rights of the debtor under the fourteenth amendment,
> Mr. Justice Miller speaks as if the constitutional right relied on were
> a right to defeat a just debt.  But the constitutional right asserted
> was the same that would be set up if the Legislature should order

---

[28] In *Davis*, the Mississippi Supreme Court stated:

> By a numerous train of decisions, it is held that the statute of limitations operates on and affects the remedy merely, and is not to extend its influence to the construction of the contract, or what is called the right.  Without pretending to question the truth of this position, I think the effect, or operation, and the remedy, may clothe a party with a defence, or a right to set up a resistance, which cannot be taken from him without his consent.  If a party be deprived of his remedy, in what does his right consist?  Whatever the rule may be in morals, in a purely legal point of view, I think it is difficult to imagine the existence of a right without some adequate remedy.  It is a maxim, that there is no right without a corresponding remedy; by which I understand that they are dependent terms; that one cannot exist without the other; that the idea of a right is predicated on, and necessarily carries with it, as essential to its existence, the means also of enforcing it; and the moment the remedy is destroyed, the right must go with it.  It is true, that the remedy may be suspended by the force of circumstances over which the party has no control, and in which he does not act.  If it be true, that the remedy is a constituent part of a right, and they cannot exist separately, must it not follow that whatever destroys the one must destroy the other?  If the statute of limitations should only operate as a suspension of the remedy, and not as a total destruction of it, the result would be the same, as that suspension is the consequence of the acts of the claimant, and it is a rule well settled, that a remedy, suspended by the act of the party entitled to it, is forever gone.

2 Miss. at 188.

> one citizen to pay a sum of money to another with whom he had been in no previous relations of any kind. Such a repeal requires the property of one person to be given to another when there was no previous enforceable legal obligation to give it. Whether the freedom of the defendant from liability is due to a technicality or to his having had no dealings with the other party, he is equally free, and it would seem logical to say that if the Constitution protects him in one case it protects him in all.

*Danforth v. Groton Water Co.*, 59 N.E. 1033, 1033 (Mass. 1901); *see also* Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 405 (2d ed. 1871) ("It is certain that he who has satisfied a demand cannot have it revived against him, and he who has become released from a demand by the operation of the statute of limitations is equally protected. In both cases the demand is gone, and to restore it would be to create a new contract for the parties,—a thing quite beyond the power of legislation." (footnote omitted)); Comment, *Campbell v. Holt—A Rule or an Exception?*, 35 Yale L.J. 478, 481 (1926) ("[L]ooking to practical results . . . there would seem to be no practical difference in the legal relations affected . . . whether the statute is labelled 'procedural' or 'substantive.'").[29]

---

[29] The dissent's citation of decisions relating to procedure, *see, e.g.*, Dissenting Opinion ¶ 101, is similarly misdirected. *See Bellegarde Custom Kitchens v. Leavitt*, 295 A.2d 909, 911 (Me. 1972) ("[T]he question whether an action is barred by a statute of limitations is a matter of substance." (quotation marks omitted)); *Hebron Acad., Inc. v. Town of Hebron*, 2013 ME 15, ¶ 29, 60 A.3d 774 (same). In a 2009 decision addressing the issue of retroactivity, we indicated that a law "may be deemed

[¶41] Notably, we also have previously rejected efforts to permit retroactivity on the ground that it only affects a remedy, instead focusing on practical effect. *See Langley v. Home Indem. Co.*, 272 A.2d 740, 746 (Me. 1971) (holding that a statute could not be applied retroactively; "To hold a law operating with such drastic impact . . . to be merely 'remedial' in character and effect would be to lose focus upon reality in the obscurity of semantic fog."); *see also Peabody v. Stetson*, 34 A. 74, 77 (Me. 1896) ("The ideas of right and remedy are inseparable. Want of right and want of remedy are the same thing." (quoting *Edwards v. Kearzey*, 96 U.S. 595, 600 (1877)).

[¶42] In *Laboree*, we noted that statutes of limitations may not be adjusted in a way that fails to allow a reasonable time after the adjustment for the plaintiff to pursue its action because otherwise the plaintiff would be deprived "of all legal remedy." 2 Me. at 293. There is no logic in the notion that the Legislature cannot shorten a limitations period retroactively to bar a claim

---

substantive if it changes the legal significance or consequences of acts or events that occurred before the amendment's effective date," citing, inter alia, *Dobson*, 415 A.2d at 816, in which we noted that a claim could not be revived after having been barred by the statute of limitations in force at the time of the occurrence of the acts or events. *In re Guardianship of Jeremiah T.*, 2009 ME 74, ¶ 19, 976 A.2d 955. There is no question that a statute of limitations has procedural aspects and, like other defenses, can be waived. But the question here is whether, after the expiration of the limitations period, a revival of a claim would interfere with a defendant's (waivable) rights. That aspect of a statute of limitations falls squarely into the definition of substantive. *See id.*; *see also* Comment, *Campbell v. Holt—A Rule or an Exception?*, 35 Yale L.J. 478, 481 (1926) (discussing how treatment of statutes of limitations for pleading or conflict of laws purposes says nothing as to the constitutional issue presented).

entirely but can entirely eliminate a limitations period retroactively to revive a claim. Any retroactive modification of a limitations period after it has run affects substantive rights *and* remedies.

[¶43] Finally, the characterization of a statute of limitations as a substance-empty procedural mechanism, merely adjusting a remedy with no practical impact on a right, misapprehends the basis for the adoption of limitation periods. Statutes of limitations have formed a part of Western jurisprudence since Roman times, with limitations in English common law on personal actions traced to the development of claims in assumpsit and the Limitation Act of 1623. *See* Note, *Developments in the Law—Statutes of Limitations*, 63 Harv. L. Rev. 1177, 1177 (1950). In discussing statutes of limitations and asking whether the defendant has "gained a right or not," Holmes traced the defendant's acquisition of "rights by lapse of time" to "further back than the first recorded history," as "in the nature of man's mind," noting that it is contrary to that nature to take away what one has gained because it "takes root in your being and cannot be torn away without your resenting the act," and "[t]he law can ask no better justification than the deepest instincts of man." Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L. Rev. 457, 476-77 (1897).

[¶44]  For all these reasons, the right-remedy distinction in *Campbell* has been rejected by many state courts, and we do the same.  *See Mitchell*, 469 P.3d at 913 ("[T]he *Campbell* dissent had it right.  A ripened limitations defense *was a vested right* that could not be retroactively divested by the legislature."); *Twomey v. Carlton House of Providence, Inc.*, 320 A.2d 98, 101 (R.I. 1974) ("Justice Bradley's views on the issue have been widely accepted by the state courts.").

> **b.**  **The Supreme Court's post-*Campbell* balancing approach is not persuasive because it is contrary to our longstanding and sound constitutional protection of vested rights.**

[¶45]  Despite Justice Holmes's identification of statutes of limitations as elemental and, as noted above, his acknowledgment in *Danforth* of the illogic of a right-remedy distinction, Holmes nevertheless departed from existing Massachusetts case law to allow the revival of an expired claim based on the "equities" under which the Legislature can look to "the prevailing views of justice."  59 N.E. at 1034.  The Supreme Court cited *Danforth* with approval in its later decision affirming the result in *Campbell*.  *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 315 (1945).  There, the Court did not affirm the holding in *Campbell* based on a vested rights analysis but rather reasoned that a revived claim is not "per se" offensive, applying a general fairness balancing approach.

*Id.* at 316. Under this approach, the concept of vested rights is deemed an antiquated protection of economic rights rejected post-*Lochner*. *See, e.g.*, *Nobrega v. Edison Glen Assocs.*, 772 A.2d 368, 382 (N.J. 2001).

[¶46] There are multiple problems with this balancing approach. First, it is contrary to Maine precedent—both longstanding and recent. *See, e.g.*, *Fales v. Wadsworth*, 23 Me. 553, 555 (1844) ("In whatever the defendant might have a vested right, it would not be competent for the legislature to violate it."); *Coffin v. Rich*, 45 Me. 507, 514-15 (1858) (the Legislature has "no constitutional power to enact retrospective laws which impair vested rights"); *Berry v. Clary*, 77 Me. 482, 485–86, 1 A. 360, 361 (1885) (same); *Town of Otisfield v. Scribner*, 129 Me. 311, 151 A. 670, 671 (1930) (same); *Sabasteanski v. Pagurko*, 232 A.2d 524, 525 (Me. 1967) (legislatures "have no constitutional power to enact retrospective laws which impair vested rights" (quotation marks omitted)); *Merrill v. Eastland Woolen Mills, Inc.*, 430 A.2d 557, 560 n.7 (Me. 1981) ("The legislature has no constitutional authority to enact retroactive legislation if its implementation impairs vested rights . . . ."); *L.V.I. Grp.*, 1997 ME 25, ¶ 22, 690 A.2d 960 ("The law is well established in Maine that [t]here can be no doubt that Legislatures have the power to pass retrospective statutes, if they affect remedies only . . . .

But they have no constitutional power to enact retrospective laws which impair vested rights." (Glassman, J., dissenting) (quotation marks omitted)).[30]

[¶47] We most recently affirmed our understanding that the Maine Constitution protects against retroactive impairment of vested rights in *NECEC*, 2022 ME 48, 281 A.3d 618. There, we did not rule that the Legislature could impair a right vested in a permit if the Legislature, Executive Branch, or a court concluded that there was a good reason to do so. To the contrary, we stated, "If the effect of the retroactive legislation is to abrogate vested rights, the rationale and basis for the legislation become irrelevant."[31] *Id.* ¶ 47 n.16; *see also Austin*

---

[30] Nor have many other jurisdictions rejected the concept of vested rights in favor of a balancing approach. *See* 2 Shambie Singer, *Sutherland Statutory Construction* § 41:4 (8th ed.) ("Modern federal and state judiciaries continue to invoke the principle to invalidate or restrict retroactive legislation that interferes with, impairs, or divests vested rights."); *e.g.*, *Dua v. Comcast Cable of Md., Inc.*, 805 A.2d 1061, 1072 (Md. 2002) ("It has been firmly settled . . . that the Constitution of Maryland prohibits legislation which retroactively abrogates vested rights. . . . The state constitutional standard for determining the validity of retroactive civil legislation is whether vested rights are impaired and *not* whether the statute has a rational basis." (emphasis in original)).

[31] A vested right is equal or similar to a species of property, which cannot be taken, even for a compelling public use, absent compensation. *See* Me. Const. art. I, § 21; Thomas M. Cooley, *A Treatise On The Constitutional Limitations Which Rest Upon The Legislative Power Of The States Of The American Union* 391 (2d ed. 1871) ("[A] vested right . . . is something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws: it must have become a title, legal or equitable, to the present or future enjoyment of property, or to the present or future enforcement of a demand, or a legal exemption from a demand made by another."); *Dardeen v. Heartland Manor, Inc.*, 710 N.E.2d 827, 830 (Ill. 1999) ("[A] right has not vested until it is so far perfected that it cannot be taken away by legislation, and so complete and unconditional that it may be equated with a property interest." (quotation marks omitted)). As we said in *NECEC*, 2022 ME 48, ¶ 44, 281 A.3d 618, rights we deem vested include "everything to which a [person] may attach a value and have a right." (Quotation marks omitted.) *See also* Edward S. Corwin, *The Basic Doctrine of American Constitutional Law*, 12 Mich. L. Rev. 247, 271 (1914) (noting that in his 1792 essay on property, James Madison viewed property as embracing "everything to which a man may attach a value and have a right." (footnotes and quotation marks omitted)).

*v. Stevens*, 24 Me. 520, 525 (1845) (citing, inter alia, *Laboree*, 2 Me. 275, and *Lewis*, 3 Me. 326) (concluding that depriving someone of a vested right would violate article III, sections 1 and 2; article VI, section 1; and article I, section 21 of the Maine Constitution).

[¶48]  Second, a fundamental objective of the Declaration of Rights as a whole is to protect the rights of the individual, no matter how attractive the judicial eradication of the right might appear to the majority.  *See In re Opinions of the Justices*, 106 A. 865, 871 (Me. 1919) ("The Declaration of Rights . . . stands to–day as it was designed by its framers to stand, as a shield for the protection of the private individual against encroachment and usurpation on the part of the governing powers."); *Delaware v. Van Arsdall*, 475 U.S. 673, 706 n.14 (1986) (Stevens, J., dissenting) ("The early state Bills of Rights were, in fact, specifically motivated by the interest in protecting the individual against overreaching by the majority.").

[¶49]  A balancing approach strips long protected rights of meaningful protection.  *See also Adams*, 51 Me. at 490 (rejecting retroactivity because if not, "the tenure . . . by which all rights are held, depend, not on the law as existing when they became vested, but upon the fluctuating will of a legislative assembly.  No rights are or can be secure.").

36

[¶50]  Third, even jurisdictions that have abandoned the vested rights approach seem to still adhere to it in inconsistent ways, rendering it unclear whether those jurisdictions that allow revival under a balancing approach do so in all circumstances and what their reasoning is for making any distinctions in when and how an amalgamated test is applied.

[¶51]  For example, the Supreme Court may or may not allow revival of a claim when its statute of limitations has expired if the claim involves property.[32]

---

[32] *Campbell v. Holt* was an action on a debt where the Court said, "It may, therefore, very well be held that in an action to recover real or personal property, where the question is as to the removal of the bar of the statute of limitations by a legislative act passed after the bar has become perfect, that such act deprives the party of his property without due process of law."  115 U.S. 620, 623 (1885). Hence, the holding appears to be based on a vested rights approach that concludes that freedom from an expired claim seeking real or personal property is a vested right, but freedom from a tort claim is only an unprotected remedy.  *See id.*  This protection from the revival of expired property claims was confirmed in *Stewart v. Keyes*, never overruled, which held that suits to recover property after the limitations period has expired violate due process.  295 U.S. 403, 417 (1935).  *Chase Securities Corporation v. Donaldson* was also a case to recover money, and, as noted, *see supra* ¶ 45, the Court re-affirmed the "holding" in *Campbell* but applied a different balancing test.  325 U.S. 304, 315-16 (1945).  Here, the dissent appears to accept that a right to be free from suit vests upon expiration of a statute of limitations and cannot constitutionally be taken away but only when "property" is involved.  Dissenting Opinion ¶¶ 84-90.  This distinction is problematic in multiple ways:

- First, as noted, *see supra* ¶ 13, our case law makes no such distinction.
- Second, the reason why our law makes no such distinction is because there is no logical basis for doing so; as noted above, the impact of reviving an expired claim is the same.  As one treatise noted, "When a right of action has once become barred by the statute of limitations in force when the liability was incurred, or vested rights of property have been acquired by the expiration of the period prescribed for suits, it is not competent for the legislature, by repealing the statute altogether, or by extending the time beyond its original limits, to revive such right of action or jeopardize the vested interests so secured."  Henry Campbell Black, *An Essay on the Constitutional Prohibitions Against Legislation Impairing the Obligation of Contracts and Against Retroactive and Ex Post Facto Laws* 191 (1887); *see also* William Pratt Wade, *A Treatise on the Operation and Construction of Retroactive Laws as Affected by Constitutional Limitations and Judicial Interpretations* 235-36 (1880) ("[W]here the period of limitation has once elapsed, the statutory bar becomes the foundation of a right, of

The Supreme Court may or may not apply a balancing test for all types of accrued actions.[33]  It may or may not allow revival if the limitation is embedded in a statute creating the claim.[34]  The Supreme Court might have, for an

---

which the party claiming it cannot be subsequently deprived by . . . an attempt to revive the action. . . . This doctrine is applicable to all laws of this character, whether they . . . have only a particular application to certain actions or proceedings." (footnotes omitted)).

- Third, this position encounters definitional difficulties.  How do we define a "property" claim versus a non-property claim? Must the property be tangible? Must the claim relate to title of property, or may it relate to injury to property? What about a governmental authorization regarding the use of property, like a permit (as in *NECEC*)?  What about entitlements?  The difficulty in trying to rely on such a distinction is illustrated in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998).  There, the Supreme Court held that retroactive liability to pay money could not be imposed. *Id.* at 537-38.  The plurality concluded that it would be a taking without just compensation, *id.*, even though, as Justice Kennedy noted in his concurrence, the obligation to pay money has not been considered a demand on property.  *Id.* at 543. Justice Kennedy would base the ruling that retroactive liability could not be imposed based on the due process clause.  *Id.* at 547 (Kennedy, J., concurring).  Justice Thomas concurred, adding that the Court should re-visit the ex post facto clause as applicable in the civil context.  *Id.* at 538-39 (Thomas, J., concurring).  Aside from illustrating the futility of imposing a property/non-property/tort distinction, these multiple opinions show how the antipathy to retroactivity runs rampant through multiple constitutional provisions.

[33] In *Coombes v. Getz*, the Court concluded that a state statute that repealed the statutory basis for the accrued causes of action of corporate creditors for debts was unconstitutional because "it did not and could not destroy or impair the previously vested right of the creditor (which in every sense was a property right) to enforce his cause of action upon the contract."  285 U.S. 434, 442 (1932) (citations omitted).  Whether this strand of precedent has been tacitly overruled is unclear.

[34] Footnote eight in *Donaldson* seems to distinguish pre-*Donaldson* decisions such as *William Danzer & Co. v. Gulf & Ship Island Railway Co.*, 268 U.S. 633 (1925), on the basis that in those decisions "the state court so construed the relationship between its limitation acts and the state law creating the asserted liability as to make these cases inapplicable."  325 U.S. at 312 n.8.  To the extent that this language is construed to mean that claims cannot be revived when they are created by a statute, then, as one state court noted, this concept seems to have been overruled—but only tacitly—in *International Union of Electrical, Radio and Machine Workers Local 790 v. Robbins & Myers, Inc.*, 429 U.S. 229, 243-44 (1976).  *See also Nachtsheim v. Wartnick*, 411 N.W.2d 882, 888 (Minn. Ct. App. 1987) ("The *Robbins & Myers* holding and stated 'test' of constitutionality therefore indicate a tacit reversal of *Danzer*."), *overruled on other grounds by Powell v. Anderson*, 660 N.W.2d 107, 114 (Minn. 2003).

38

unarticulated reason, transformed the vested rights concept into a rule of statutory construction.[35]   The Supreme Court has also not been particularly clear as to what level of scrutiny should be given to the basis for the revival,[36] or to determine whether revival in an individual case would be too harsh or oppressive to be permitted.[37]

---

[35] *See, e.g.*, *Vartelas v. Holder*, 566 U.S. 257, 266 (2012); *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006).

[36] In *Landgraf v. USI Film Products*, the Court stated, "The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause 'may not suffice' to warrant its retroactive application."   511 U.S. 244, 266 (1994).   Whether this language means scrutiny is greater for a retroactive statute than the rational basis scrutiny ordinarily applied to prospective economic legislation under the federal substantive due process clause is unclear.   In *Apfel*, Justice Kennedy said that the imposition of a coal act was unconstitutional under the Due Process Clause because the new liability was imposed on entities lacking a causative link to the societal need addressed by the legislation.   524 U.S. at 549-50 (Kennedy, J., concurring).   To what extent this causal link requirement has been massaged into the Supreme Court's retroactivity analysis or imposes a stricter than rational basis review is unclear.

[37] In *Donaldson*, the Court indicated that it was ruling only that revival "per se" was not forbidden but left open the possibility that, in an individual situation, revival might be deemed too harsh or oppressive.   *See* 325 U.S. at 315-16.   In *United States Trust Company v. New Jersey*, 431 U.S. 1 (1977), the Court may or may not have been contemplating a hardship exception as a general rule, as opposed to an individual case-by-case review.   *Id.* at 17 n.13 ("The Due Process Clause of the Fourteenth Amendment generally does not prohibit retrospective civil legislation, unless the consequences are particularly 'harsh and oppressive.'").   Thus, a test examining whether a retroactive statute is harsh or oppressive may be incorporating a balancing test that not only balances when identifying whether a retroactive statute is constitutional in general, but also whether retroactive application in an individual case would be too harsh.   Or it may not.

The dissent is silent on any hardship exception and thus presumably rejects it.   If so, it not only appears to go further than the Supreme Court, if the Supreme Court recognizes such an exception, but also some jurisdictions within the category of those that allow revival of claims.   *See, e.g.*, *Roe v. Doe*, 581 P.2d 310, 316-17 (Haw. 1978); *Riggs Nat. Bank of Washington, D.C. v. District of Columbia*, 581 A.2d 1229, 1241 (D.C. 1990) (both citing *Donaldson*, 325 U.S. 304).   Given the dissent's rejection, the dissent sees no due process concerns under the most extreme scenarios, *e.g.*, a situation in which a defendant could be held vicariously liable for millions of dollars based on an injury that occurred generations ago and against which liability could not be extended to the defendant at the time and when, due to time and reliance on the law in effect, all relevant witnesses and exhibits have long

[¶52] Finally, as reflected by the multiplicity of our constitutional provisions flowing from a fundamental antipathy to retroactivity, the concept of vested rights as rights protected from legislative tampering also animates our constitutions. *See* 25 *The Papers of Alexander Hamilton* 529-35 (Harold C. Syrett et al. eds., 1977) (The Examination No. XII (Feb. 23, 1802)) ("The proposition, that a power to do, includes virtually, a power to undo, as applied to a legislative body, is generally but not universally true. All *vested rights* form an exception to the rule."); Edward S. Corwin, *The Basic Doctrine of American Constitutional Law*, 12 Mich. L. Rev. 247, 276 (1914) (the vested rights doctrine represents "the essential spirit and point of view of the founders of American Constitutional Law").[38]

[¶53] In sum, consistent with the understanding of the founders, we have always adhered to and reaffirmed as recently as 2022 the protection of vested rights under our Constitution; these rights are not subject to destruction,

---

disappeared, so the defendant has been rendered helpless to defend itself. While we do not apply a due process balancing test to erode vested rights, that does not mean that even when rights have not vested, due process concerns cannot arise when the fundamentals of a fair trial are lacking. Put simply, the dissent posits that revival is not only facially constitutional but can never be unconstitutional as applied.

[38] Hamilton and Corwin are cited in Gordon S. Wood, *The Origins of Vested Rights in the Early Republic*, 85 Va. L. Rev. 1421, 1437, 1442 (1999), in which Wood outlines how vested rights formed the backbone of the concept reflected in Declarations and Bills of Rights that certain private rights are protected from legislative tampering and through judicial review.

however compelling the reason for destroying the right. A balancing test is not only contrary to our precedent but unsupported by our constitutional text and the common law, and is amorphous, inconsistent, unworkable, and could potentially trample constitutionally protected rights based on transient majority inclination or the view of an individual judge.

[¶54] For all these reasons, we do not find these lines of authority deviating from our precedent persuasive.

### 5. Sociological considerations support prospective, not retroactive, elimination of statutes of limitations for sexual assaults.

[¶55] There can be no doubt that we as a society have gained a new understanding of the effect of trauma and the delays that it can cause in the ability of a victim to pursue a cause of action. Such evolved knowledge provides support for the elimination of any statute of limitations for torts involving sexual assaults. But the issue here is not the propriety of the elimination of a statute of limitations but rather the revival of a claim after the relevant existing statute of limitations has expired. As one court explained:

> We can appreciate the moral impulse and substantial policy justifications for the legislature's decision to revive previously time-barred claims of victims of child sex abuse. Child sex abuse is a 'massive national problem' whose devastating 'effects . . . often span a lifetime.' For a variety of reasons, moreover, 'the majority of child sexual abuse survivors [do] not disclose their abuse until

adulthood.' The legislature clearly had these concerns in mind in enacting Utah Code section 78B-2-308(7). And that judgment is an eminently reasonable one at a policy level.

The question presented for us, however, is not a matter of policy. We are asked to give voice to the limitations on our government established in the charter—the constitution—ratified by the voice of the people. The terms of that charter merit our respect unless and until they are amended or repealed. And we must enforce the original understanding of those terms whether or not we endorse its dictates as a policy matter.

We render our decision with this in mind. The problems presented in a case like this one are heart-wrenching. We have enormous sympathy for victims of child sex abuse. But our oath is to support, obey, and defend the constitution. And we find the constitution to dictate a clear answer to the question presented. The legislature lacks the power to retroactively vitiate a ripened statute of limitations defense under the Utah Constitution.

*Mitchell*, 469 P.3d at 913-14 (footnotes omitted).

### III. CONCLUSION

[¶56] Not all retroactive legislation is prohibited, but retroactive legislation cannot impair vested rights. Once a statute of limitations has expired for a claim, a right to be free of that claim has vested, and the claim cannot be revived. For the reasons given above, section 752-C(3) is unconstitutional as applied to expired claims.

42

The entry is:

> Report accepted as to one question, which is answered in the affirmative as indicated in the opinion. Remanded for further proceedings consistent with this opinion.

--------

DOUGLAS, J., with whom LAWRENCE, J., joins, dissenting.

[¶57] Our Constitution does not require the result the Court reaches today. Nor does our caselaw. I therefore respectfully dissent.

[¶58] To be clear, despite the Court's pronouncement that "[w]e have declared many times that a claim cannot be revived after the expiration of its statute of limitations," Court's Opinion ¶ 11, this is a case of first impression in Maine. The Court essentially acknowledges as much when it observes that the enactment of 14 M.R.S. § 752-C(3) (2022)[39] was "the first time in over two hundred years that the Legislature has attempted to revive causes of action after their statutes of limitations ha[ve] run." Court's Opinion ¶ 32.

[¶59] True, some of our prior decisions may have said or implied that lapsed claims cannot be revived. Never before, though, have we squarely

--------

[39] Title 14 M.R.S. § 752-C has recently been amended but not in any way that affects this appeal. *See* P.L. 2023, ch. 475, § 1 (effective Oct. 25, 2023) (codified at 14 M.R.S. § 752-C (2024)).

confronted the issue presented by this case: whether the Maine Constitution prohibits the Legislature from enacting a statute that retroactively repeals a statute of limitations, thereby allowing a previously barred claim to proceed. I therefore do not find these prior decisions—or, more precisely, statements amounting to dicta made in the course of those decisions—to be binding or persuasive here. Moreover, the fact that the Legislature previously may not have enacted such legislation does not negate its constitutional authority to do so. Rather, it simply may spotlight the uniqueness and urgency of the circumstances prompting the Legislature to rebalance competing policies—and to take the action it did—in this particular instance.

[¶60] Here is where I part company with the Court's reasoning: I do not agree that the running of a statute of limitations—an arbitrary constraint on bringing suit that "represent[s] a public policy about the privilege to litigate," *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945), first imposed, then removed, by the Legislature—amounts to a vested right consistent with those that our jurisprudence has recognized to date. To conclude otherwise, as the Court does here, effectively confers an absolute constitutional right upon an alleged tortfeasor to be relieved of having to answer to a lawsuit of this nature based on the age of the claim, regardless of the circumstances and contrary to other express constitutional guarantees. "[T]here is no such thing as a vested

right to do wrong . . . ." *Danforth v. Groton Water Co.*, 59 N.E. 1033, 1034 (Mass. 1901) (Holmes, C.J.) (quotation marks omitted).

[¶61] Indeed, the unusual circumstances that section 752-C(3)'s retroactive operation addresses make it a reasonable legislative response consistent with due process that eliminates a procedural bar that previously prevented Dupuis and other similarly situated individuals from proceeding with actions in pursuit of remedies for the injuries they claim. It is important to set out fully my reasoning, beginning with the specific factual context that gave rise to the reported issue.

## I. BACKGROUND

### A. Allegations in the Complaint

[¶62] Robert E. Dupuis filed the complaint in this case in 2022, naming the Roman Catholic Bishop of Portland as the sole defendant. The allegations set out in the complaint, assumed to be true for purposes of our review at this juncture, *see Cunningham v. Haza*, 538 A.2d 265, 267 (Me. 1988), are as follows.

[¶63] In 1961, when he was twelve years old, Dupuis approached a trusted adult in his community, looking for a summer job. That adult was Father John J. Curran, a priest and holy leader of the St. Joseph Church in Old Town, where Dupuis was a parishioner and student. Father Curran hired Dupuis to assist with groundskeeping, banquet setup, and other tasks at the church.

[¶64] When Dupuis went to collect his paychecks, Father Curran would invite him into his "office," a closet, for private "prayer sessions." In these sessions, Father Curran ritualistically groomed and sexually assaulted Dupuis. Father Curran would then give Dupuis his paycheck and dismiss him.

[¶65] These "prayer sessions" occurred repeatedly over the course of several months. At the final session, Father Curran became angry with Dupuis for resisting and eventually told Dupuis to "get the hell out of here," saying Dupuis had "nothing to offer [him]." Father Curran then fired Dupuis, telling others that Dupuis was "unreliable."

[¶66] Shortly afterward, the Bishop reassigned Father Curran to St. Augustine Parish in Augusta. As for Dupuis, he became an outcast in his community and suffered significant emotional damage. It was not until decades later, when he was in his forties and the statute of limitations had run, that Dupuis first opened up about the abuse he suffered at Father Curran's hands.

[¶67] The complaint alleges, among other things, that the Bishop "knew or reasonably should have known of the risk to minor parishioners of childhood sex abuse perpetrated by members of its clergy . . . based on actual notice of events occurring under the control of the Roman Catholic Bishop of Portland since at least 1955."

46

## B.    Delayed Disclosure

[¶68]   The phenomenon of "delayed disclosure" by childhood sexual abuse survivors is now well understood and clinically confirmed.  Over the last several decades, an extensive body of research has demonstrated that individuals who endured sexual abuse as children experience that trauma in ways distinct from victims of other crimes.[40]  Many studies "have documented the psychological barriers to revealing the abuse and have shown that, typically, a survivor needs decades to process and understand the abuse."  Marci A. Hamilton, *The Time Has Come for a Restatement of Child Sex Abuse*, 79 Brook. L. Rev. 397, 400 (2014).  "As a result, many [victims] do not tell others about the abuse until their forties, fifties, or even later."  *Id.*; *see also* Andrew Ortiz, *Delayed Disclosure: Child USA 2024 Factsheet*, Child USA 1-3 (2024),

---

[40]  *See* Rosaleen McElvaney, *Disclosure of Child Sexual Abuse: Delays, Non-disclosure and Partial Disclosure.  What the Research Tells Us and Implications for Practice*, 24 Child Abuse R. 159, 160, 163-64 (2015) ("There is consensus in the research literature that most people who experience sexual abuse in childhood do not disclose this abuse until adulthood, and when disclosure does occur in childhood, significant delays are common."); David Viens, *Countdown to Injustice: The Irrational Application of Criminal Statutes of Limitations to Sexual Offenses Against Children*, 38 Suffolk U. L. Rev. 169, 169 (2004) ("Child sexual abusers are rarely prosecuted for their crimes because many victims never report the abuse to authorities, and many of those who do report the abuse later become unable to face their abusers in court.  Abusers are able to further hinder prosecution by threatening or intimidating the victims, and by convincing their victims that the abuse is normal.  As time passes, many of these obstacles cease to exist, and adult survivors of childhood sexual abuse often seek redress years later." (footnotes omitted)).  This Court, too, has recognized the delayed disclosure phenomenon in cases of childhood sexual abuse.  *See, e.g.*, *State v. Smith*, 2024 ME 56, ¶¶ 23-29, 320 A.3d 405; *State v. Paquin*, 2020 ME 53, ¶¶ 16-18, 230 A.3d 17, *abrogated on other grounds by State v. Armstrong*, 2020 ME 97, ¶¶ 7-12, 237 A.3d 185.

https://childusa.org/wp-content/uploads/2024/06/Delayed-Disclosure-2024.pdf [https://perma.cc/4SAH-ZJVD].

[¶69]  This presents an obvious problem for victims of child sexual abuse who, later in life, when they finally are able to disclose the trauma they experienced, seek some measure of justice.  For some, like Dupuis and the other twelve plaintiffs who have filed similar claims, the passage of time put them beyond the legislatively prescribed period for filing suit before they were in a position to consider seeking redress.

## C.     Past Legislative Efforts to Ameliorate Effect of Statute of Limitations

[¶70]  At the time of the alleged abuse in this case, there was a general six-year limitations period applicable to most civil actions and a two-year limitations period applicable specifically to actions for assault and battery. *See* R.S. ch. 112, § 90 (Supp. 1961) (later codified at 14 M.R.S.A. § 752 (1964)); R.S. ch. 112, § 93 (1954).  In 1985, the Legislature began making a series of modifications to the statute of limitations as it pertained to claims involving alleged sexual abuse of minors.  The first step was enacting 14 M.R.S.A. § 752-C, which established a separate, six-year limitations period for claims based upon "[s]exual acts towards minors."  P.L. 1985, ch. 343, § 1 (effective Sept. 19, 1985). In the same legislation, the Legislature enacted 14 M.R.S.A. § 853, which

provided for the tolling of the limitations period during any period of disability, including minor status.  P.L. 1985, ch. 343, § 2 (effective Sept. 19, 1985).

[¶71]  Four years later, in 1989, the Legislature amended section 752-C by adding a three-year discovery-rule exception, allowing a claim alleging a sexual act toward a minor to be commenced within six years "or within [three] years of the time the person discovers or reasonably should have discovered the harm, whichever occurs later."  P.L. 1989, ch. 292 (effective Sept. 30, 1989). In 1991, the Legislature enlarged the limitations period in section 752-C from six to twelve years and doubled the discovery-rule exception from three to six years.  *See* P.L. 1991, ch. 551, § 1 (effective Oct. 9, 1991).

[¶72]  In 2000, the Legislature eliminated entirely the limitations period applicable to claims based upon sexual acts toward minors.  P.L. 1999, ch. 639, § 1 (effective Aug. 11, 2000).   The new legislation was codified in section 752-C(1), which provided:

> **1. No limitation**.  Actions based upon sexual acts toward minors may be commenced at any time.

[¶73]   These legislative changes were prompted by an evolving awareness of the lasting impacts that childhood sexual abuse has on victims and the related dynamics of delayed disclosure.  The expansion, and eventual elimination, of the limitations period applied only to cases filed after the

effective date of the legislative change and to cases in which the previously effective statutory period had not yet run. P.L. 1991, ch. 551, § 2; P.L. 1999, ch. 639, § 2. This left behind a limited number of individuals, including Dupuis, whose disclosures of childhood sexual abuse were made after the expiration of the six-year limitations period applicable at the time the abuse occurred and before the remedial adjustments were made to section 752-C.

[¶74] Ultimately, in 2021, a bill, L.D. 589 (130th Legis. 2021), was introduced to address this shortcoming. The purpose of the bill was "to provide justice for people who may not have [had] a voice for themselves at the time of their abuse" because they "were too scared, young or otherwise inhibited from coming forward to report their abusers" in time to come within the statute of limitations. *An Act to Provide Access to Justice for Victims of Child Sexual Abuse: Hearing on L.D. 589 Before the J. Standing Comm. on Judiciary*, 130th Legis. 1 (2021) (testimony of Sen. Donna Bailey). The Legislature passed the bill, and the governor signed it into law, thereby enacting 14 M.R.S. § 752-C(3). P.L. 2021, ch. 301, § 1 (effective Oct. 18, 2021). Section 752-C(3) provides as follows:

> **3. Application.** [Section 752-C] applies to all actions based upon sexual acts toward minors regardless of the date of the sexual act and regardless of whether the statute of limitations on such actions expired prior to the effective date of this subsection.

## II.  DISCUSSION

[¶75]  The Court's holding that section 752-C(3) as applied here is an unconstitutional exercise of legislative power is rooted in its conclusions that our "[c]onstitutional text confirms that a claim cannot be revived after the expiration of its statute of limitations." Court's Opinion ¶ 18.  For the reasons that follow, I conclude otherwise—and begin with what I see as the constitutionally appropriate lens through which we should be evaluating the issue before us in this case.

### A.    Separation of Powers and the Presumption of Constitutionality

[¶76]  The Court enlists article III of the Maine Constitution—our separation of powers clause[41]—in aid of its determination that retroactive laws were "not deemed by the framers to be a 'law' within the power of the Legislature to enact."  Court's Opinion ¶¶ 22-23.  Unquestionably, article III's separation and distribution of powers in our government—principles which we have emphasized are "much more rigorous [in this respect] than the same principle[s] as applied to the federal government," *Bates v. Dep't of Behav. &*

---

[41]  Article III, section 1 of the Maine Constitution provides: "The powers of this government shall be divided into 3 distinct departments, the legislative, executive and judicial."  Article III, section 2 provides: "No person or persons, belonging to one of these departments, shall exercise any of the powers properly belonging to either of the others, except in the cases herein expressly directed or permitted."  It is noteworthy—and an indication of the prominence with which the concept of distributed powers was viewed—that a separate article is devoted to this idea and that the article was placed third, following only the declaration of rights in article I and the delineation of electors in article II.

*Developmental Servs.*, 2004 ME 154, ¶ 84, 863 A.2d 890 (quotation marks omitted)—come into play when testing the constitutional mettle of legislative enactments. The "more rigorous" view we take to enforcing our separation of powers clause necessarily informs the way we approach, and the strict standard we apply to, the task of evaluating the constitutionality of a duly enacted statute. *Id.*

[¶77] The Maine Constitution confers expansive powers upon the legislative branch to "make and establish all reasonable laws and regulations for the defense and benefit of the people of this State, not repugnant to this Constitution, nor to that of the United States." Me. Const. art. IV, pt. 3, § 1; *see also Opinion of the Justices*, 133 Me. 532, 535, 178 A. 613, 615 (1935) ("[T]he lawmaking power . . . is measured, not by grant, but by limitation. It is absolute and all-embracing except as expressly or by necessary implication limited by the Constitution."). Legislative authority "defies definitional specifics as it is comprehensive and all embracing in concept and its operational scope must envision a constant expansion and ever ready elasticity to meet the new and increasing demands for its exercise for the benefit of society."[42] *Ace Tire Co. v. Mun. Officers of Waterville*, 302 A.2d 90, 96-97 (Me. 1973).

---

[42] In contrast, the judicial and executive departments "can exercise only the powers enumerated in and conferred upon them by the Constitution and such as are necessarily implied therefrom."

52

[¶78]   In light of the broad grant of power to the Legislature and article III's rigorous operation, we acknowledged early on that

> [i]t is an undisputed principle, that every act of the legislature, passed in due form, is presumed to be constitutional.  Respect for that body requires such presumption.  It is a principle equally clear, that *this Court ought not, in a doubtful case, to pronounce such an act unconstitutional; it should be plainly in violation of constitutional requirements or restraints, and beyond the boundaries of correct legislation to authorize the Court so to adjudge it*.

*Trs. of New Gloucester Sch. Fund v. Bradbury*, 11 Me. 118, 126 (1834) (emphasis added); *see State v. Rogers*, 95 Me. 94, 98, 49 A. 564, 565 (1901) ("The power of the judicial department of the government to prevent the enforcement of a legislative enactment, by declaring it unconstitutional and void, is attended with responsibilities so grave that its exercise is properly confined to statutes that are clearly and conclusively shown to be in conflict with the organic law."); *Baxter v. Waterville Sewerage Dist.*, 146 Me. 211, 214, 79 A.2d 585, 587 (1951) ("All acts of the Legislature are presumed to be constitutional and this is a presumption of great strength." (quotation marks omitted)).

[¶79]   Put another way, because a duly enacted law reflects the considered judgment of our coequal branches of government—the "representatives of the actual people of the here and now" who are elected to

---

*Sawyer v. Gilmore*, 109 Me. 169, 83 A. 673, 678 (1912); *see* Me. Const. art. V, pt. 1 (defining the executive power); Me. Const. art. VI (defining the judicial power).

make decisions and take actions that respond to current needs, Alexander M. Bickel, *The Least Dangerous Branch: The Supreme Court at the Bar of Politics* 17 (2d ed. 1986)—one challenging a statute "bears a heavy burden of proving unconstitutionality," *Jones v. Sec'y of State*, 2020 ME 113, ¶ 18, 238 A.3d 982 (quotation marks omitted). Such a challenge "*must demonstrate convincingly that the statute and the Constitution conflict.*" *Bouchard v. Dep't of Pub. Safety*, 2015 ME 50, ¶ 8, 115 A.3d 92 (emphasis added); *see also Opinion of the Justices*, 623 A.2d 1258, 1262 (Me. 1993) (confirming that a party can overcome the presumption of a statute's constitutionality "only if there is a clear showing by strong and convincing reasons that [the statute] conflicts with the Constitution" (quotation marks omitted)). "All reasonable doubts must be resolved in favor of the constitutionality of the enactment." *Jones*, 2020 ME 113, ¶ 18, 238 A.3d 982 (alteration and quotation marks omitted).

[¶80] The powers conferred by our Constitution upon the Legislature are broad but not unlimited. Article IV expressly confines legislative authority by its reference to both the Maine Constitution and the U.S. Constitution, stating that the Legislature is vested with broad power to make laws "not repugnant to this Constitution, nor to that of the United States." Me. Const. art. IV, pt. 3, § 1. A statute therefore must clear both constitutional hurdles to survive a challenge. Close examination of each is required.

[¶81]  With respect to interpreting the Maine Constitution, we recently recommitted to use of the so-called primacy approach.  *See State v. Athayde*, 2022 ME 41, ¶¶ 20-21, 277 A.3d 387.  This means we analyze state constitutional issues independently, focusing upon our own jurisprudence interpreting the Maine Constitution before considering prior interpretations that may have relied upon federal precedent in aid of either construing our Constitution or interpreting corresponding provisions of the federal Constitution—resorting to federal law "if the state constitution does not settle the issue."  *Id.* ¶ 20; *see also State v. Reeves*, 2022 ME 10, ¶ 41, 268 A.3d 281.  But we may consider federal interpretations of analogous provisions of the U.S. Constitution "if we deem those interpretations persuasive."  *Athayde*, 2022 ME 41, ¶ 20, 277 A.3d 387.

[¶82]  An independent analysis of the state constitutional issue is undertaken below.  However, I think it important to preface that analysis by examining whether section 752-C(3) violates federal constitutional principles, for three reasons.  First, as just noted, state statutes must pass muster under both the Maine Constitution and the U.S. Constitution to be a legitimate exercise of legislative power.  Second, in my view, an independent analysis under the Maine Constitution "does not settle the issue."  *Athayde*, 2022 ME 41, ¶ 20, 277 A.3d 387.  And third, an understanding of the relevant federal jurisprudence is

helpful in framing the contours of the state constitutional provisions at issue here.

## B. The U.S. Constitution

[¶83] Plainly, section 752-C(3) is "not repugnant" to the U.S. Constitution as that term is used in Me. Const. art. IV, pt. 3, § 1. Long standing precedent holds that the Fourteenth Amendment does not bar state legislatures from enacting legislation reviving claims that have lapsed due to the expiration of statutorily prescribed periods of limitations.

[¶84] Over a century ago, the Supreme Court of the United States held that statutes of limitations affect remedies, *not* vested rights, and that "no right is destroyed when the law restores a remedy which ha[s] been lost." *Campbell v. Holt*, 115 U.S. 620, 628 (1885).[43] *Campbell* held that a statute reviving an action brought to collect a contract debt after the expiration of a limitations period did not violate the guarantee of due process under the Fourteenth Amendment of the U.S. Constitution because one does not have "*property* in the bar of the statute as a defense to [a] promise to pay." *Id.* at 629. The exception to this rule, according to *Campbell,* is for matters involving ownership of

---

[43] This case is being cited only for the narrow proposition discussed in the text.

"tangible property, real or personal," in which case removal of the bar "deprives the party of his property without due process of law." *Id.* at 622-23.

[¶85]  Sixty years later, in 1945, the Supreme Court reaffirmed its holding in *Campbell*, stating that, under the Fourteenth Amendment, "where lapse of time has not invested a party with *title to real or personal property*, a state legislature . . . may repeal or extend a statute of limitations, even after right of action is barred thereby, restore to the plaintiff his remedy, and divest the defendant of the statutory bar." *Donaldson*, 325 U.S. at 311-12, 315-16 (emphasis added).  At issue in *Donaldson* was whether a Minnesota statute reviving a claim under that state's Blue Sky Law violated due process under the Fourteenth Amendment. *Id.* at 305-08.  The Supreme Court noted that the effect of the legislation "was merely to reinstate a lapsed remedy" and, there being no "vested right to immunity," "reinstatement of the remedy by the state legislature did not infringe any federal right under the Fourteenth Amendment." *Id.* at 312 n.8.

[¶86]  In explaining its rationale, the Supreme Court characterized statutes of limitations in this way:

> They are by definition arbitrary, and . . . come into the law not through the judicial process but through legislation.  They represent a public policy about the privilege to litigate.  *Their shelter has never been regarded as what now is called a 'fundamental' right or what used to be called a 'natural' right of the*

*individual.* [A defendant] may, of course, have the protection of the policy while it exists, but the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.

*Id.* at 314 (emphasis added and footnote omitted); *see also Rockland & Rockport Lime Corp. v. Ham*, 38 F.2d 239, 241 (D. Me. 1930) (citing *Campbell*, 15 U.S. at 621).

[¶87]   *Campbell* and *Donaldson* are still controlling federal law with respect to this principle.[44]   *See, e.g.*, *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 893 (1988) (citing *Donaldson* for the proposition that "statute of limitations defenses are not a fundamental right" protected by the Fourteenth Amendment); *see also Myrick v. James*, 444 A.2d 987, 994-95 (Me. 1982) (citing *Donaldson* as "accurately synthesiz[ing] the nature, purpose and effect of statutes of limitations"), *superseded by statute on other grounds by* 24 M.R.S. § 2902 (2024).

---

[44] The Court discounts these opinions and prefers the reasoning of the dissent in *Campbell v. Holt*, 115 U.S. 620, 630-34 (1885) (Bradley, J., dissenting) and of Justice Holmes's critique of *Campbell* in *Danforth v. Groton Water Co.*, 59 N.E. 1033, 1033 (Mass. 1901).  Court's Opinion ¶¶ 37-44.  As the Court notes, Court's Opinion ¶ 45, however, the views expressed by Justice Holmes in *Danforth* belie the holding of that case, which is that the Legislature may "call a liability into being where there was none before, if the circumstances were such as to appeal with some strength to the prevailing views of justice, and if the obstacle in the way of the creation seemed small."  *Danforth*, 59 N.E. at 1034. Although the Court suggests that *Campbell's* reasoning "has been rejected by many state courts" (citing two states in particular—Utah and Rhode Island), Court's Opinion ¶ 44, a number of state courts have not rejected its reasoning, *see infra* ¶ 117 & n.58.  And, as noted above, *Campbell* and *Donaldson* remain binding federal precedent.

[¶88] The due process clause in article I, section 6-A, of our Constitution, which the Bishop apparently invokes as the basis for his due process challenge, closely mirrors the Fourteenth Amendment Due Process Clause of the U.S. Constitution. *Compare* Me. Const. art. 1, § 6-A ("No person shall be deprived of life, liberty or property without due process of law . . . ."), *with* U.S. Const. amend. XIV, § 1 ("No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."). This similarity is not a coincidence. As the Court acknowledges, Court's Opinion ¶ 20 n.13, article I, section 6-A was adopted on the recommendation of the Maine Constitutional Commission of 1963, which urged the Legislature to adopt "[a] due process clause, similar to that which appears as the 14th Amendment to the United States Constitution." L.D. 33 at 2 (101st Legis. 1963); *see* Tinkle, *The Maine State Constitution* 45 (2d. ed. 2013) ("The commission intended the amendment to embody due process and equal protection guarantees similar to those of the Fourteenth Amendment to the federal Constitution.").

[¶89] Not only is article I, section 6-A modeled after its federal counterpart, the Fourteenth Amendment, but we have repeatedly recognized that "[t]he Maine and United States Constitutions create coextensive due process rights." *Doe I v. Williams*, 2013 ME 24, ¶ 61, 61 A.3d 718; *see also MSAD 6 Bd. of Dirs. v. Town of Frye Island*, 2020 ME 45, ¶ 36, 229 A.3d 514 ("The rights

guaranteed by article I, section 6-A of the Maine Constitution are coextensive with those guaranteed by the Fourteenth Amendment of the United States Constitution."); *Penobscot Area Hous. Dev. Corp. v. City of Brewer*, 434 A.2d 14, 24 n.9 (Me. 1981) ("This Court has long adhered to the principle that the Maine Constitution and the Constitution of the United States are declarative of identical concepts of due process.").

[¶90]    The Supreme Court's interpretation of the Fourteenth Amendment's Due Process Clause neither dictates nor constrains our interpretation of article I, section 6-A.  However, in light of section 6-A's history and our "long adherence" to the view that the principles of the former define the scope of the rights adopted in the latter, I find resort to federal law to be of considerable persuasive force in framing the principles of due process at play in our Constitution on the issue presented here.

## C.    The Maine Constitution

[¶91]    Our current approach to interpreting the Maine Constitution requires an examination of the document's text, history, and structure; case law and common law principles that may illuminate constitutional meaning and intent; economic and sociological factors; and precedent from other jurisdictions to the extent it may be persuasive.  *See State v. Moore*, 2023 ME 18, ¶ 18, 290 A.3d 533; *Winchester v. State*, 2023 ME 23, ¶ 14, 291 A.3d 707,

*Athayde*, 2022 ME 41, ¶¶ 20-21, 277 A.2d 387.  Examination of these factors

does not "demonstrate convincingly," *Bouchard*, 2015 ME 50, ¶ 8, 115 A.3d 92

(quotation marks omitted), that our Constitution's "text confirms that a claim

cannot be revived after the expiration of its statute of limitations."  Court's

Opinion ¶ 18.

### 1.    Text, History, and Structure

[¶92]   We have emphasized that, in construing our Constitution, it is

essential to begin with its text, and to "look primarily to the language used."

*Avangrid Networks, Inc. v. Sec'y of State*, 2020 ME 109, ¶ 14, 237 A.3d 882

(quotation marks omitted); *see also Parker v. Dep't of Inland Fisheries & Wildlife*,

2024 ME 22, ¶ 18, 314 A.3d 208 ("To determine whether the Maine Constitution

and a Maine statute conflict, we look primarily to the plain language of both.").

### a.    Express Textual Basis

[¶93]   Looking "primarily to the language" used by the framers,

*Avangrid Networks, Inc.*, 2020 ME 109, ¶ 14, 237 A.3d 882, it is telling that there

is not a single provision in the Maine Constitution that prohibits the Legislature

from enacting a law that would retroactively revive claims.  By comparison,

other state constitutions do have such express prohibitions.[45]  Ours does not.

---

[45]  The state constitutions of Alabama and Oklahoma, for example, explicitly provide that the legislatures in those state are without power to revive a lapsed claim.  *See, e.g.*, Ala. Const. art. IV, § 95 ("[T]he legislature shall have no power to revive any right or remedy which may have become barred

Nor does the Maine Constitution deny the Legislature authority generally to enact laws that operate retrospectively. *See Proprietors of Kennebec Purchase v. Laboree*, 2 Me. 275, 288–89 (1823) ("It is true that there is no express provision in our constitution, as there is in that of New-Hampshire, by which the legislature are prohibited from enacting retrospective laws . . . ." (emphasis omitted)).[46]   Again, by comparison, although our Constitution does not so provide, the constitutions of other states do expressly prohibit or limit legislation that operates retrospectively.[47]

---

by lapse of time, or by any statute of this state."); Okla. Const. art. V, § 52 ("*The Legislature shall have no power to revive any right or remedy which may have become barred by lapse of time, or by any statute of this State.*  After suit has been commenced on any cause of action, the Legislature shall have no power to take away such cause of action, or destroy any existing defense to such suit." (emphasis added)).

[46]   The Court relies on the second clause of this sentence—"'though upon examination, we apprehend it will be found to contain certain provisions which were intended to be, and must be considered, as prohibitions'"—to suggest that we read such a general prohibition into the Maine Constitution.  Court's Opinion ¶ 26 (emphasis omitted) (quoting *Proprietors of Kennebec Purchase v. Laboree*, 2 Me. 275, 288-89 (1823)).  This language refers to specific prohibitions in the Maine Constitution that proscribe only certain types of retroactive legislation. *See Laboree*, 2 Me. at 290-91, 293 (discussing when retroactive laws may violate the constitutional prohibitions against taking private property without just compensation, *see* Me. Const. art. I, § 21, and impairing the obligations of contracts, *see id.* art. I, § 11, but also depriving a person of property acquired under the standing laws, *see id.* art. I, § 1).  For the reasons discussed below, it is my view that *Laboree* has a more limited scope, at least as applied in this case. *See infra* ¶¶ 120-22, 125-26.

[47]   The state constitutions in Colorado, Georgia, Missouri, Tennessee, Texas, and, as further discussed herein, New Hampshire all have express prohibitions against retrospective laws. *See, e.g.*, Colo. Const. art. II, § 11 ("No ex post facto law, nor law impairing the obligation of contracts*, or retrospective in its operation*, or making any irrevocable grant of special privileges, franchises or immunities, shall be passed by the general assembly." (emphasis added)); Ga. Const. art. I, § I, para. X ("No bill of attainder, ex post facto law, *retroactive law*, or laws impairing the obligation of contract or making irrevocable grant of special privileges or immunities shall be passed." (emphasis added)); Mo. Const. art. I, § 13 ("[N]o ex post facto law, nor law impairing the obligation of contracts, *or retrospective in its operation*, or making any irrevocable grant of special privileges or immunities, can be enacted." (emphasis added)); Tenn. Const. art. I, § 20 ("*[N]o retrospective law,* or law impairing the obligations of contracts, shall be made." (emphasis added)); Tex. Const. art. I, § 16 ("No bill of

62

[¶94]   Had the framers of our Constitution intended to divest the Legislature of authority to enact retroactive laws, including those which proscribed claim revival, or even to express a general antipathy to such legislation, they easily could have said so.  The New Hampshire Constitution gave them the perfect template.[48]   Adopted in 1784, the New Hampshire Constitution unequivocally states: "Retrospective laws are highly injurious, oppressive, and unjust.  No such laws, therefore, should be made, either for the decision of civil causes, or the punishment of offenses."  N.H. Const. pt. I, art. 23.

[¶95]  The framers of our Constitution clearly opted not to follow New Hampshire's lead.  This omission deserves considerable weight in a textual exegesis of our Constitution.[49]   *Cf. Opinion of the Justices*, 146 Me. 316, 323,

---

attainder, ex post facto law, *retroactive law,* or any law impairing the obligation of contracts, shall be made." (emphasis added)).

  [48]   The framers certainly were familiar with, and relied upon, provisions in the constitutions of other jurisdictions, including Massachusetts and New Hampshire, in drafting the Maine Constitution.  Because the Massachusetts Constitution had been adopted nearly forty years earlier, the framers of the Maine Constitution tended to "follow[ ] the example of more recent constitutions" such that "[t]he majority of the provisions in Maine's supreme law came from other constitutions, including (to name only a few) those of Connecticut, Delaware, Indiana, Kentucky, *New Hampshire*, and the United States."  Tinkle, *The Maine State Constitution* 6-7 (2d ed. 2013) (emphasis added).

  [49]   The Court concludes—erroneously in my view—that the framers' omission of an express prohibition against retroactive legislation "was of no moment," Court's Opinion ¶ 26, basing this conclusion on *Laboree*, wherein we stated that other provisions in our Constitution "were intended to be, and must be considered, as such prohibitions."  2 Me. at 288-89.  As noted, *Laboree* did not rely on an express constitutional basis for barring all retroactive legislation but rather implied a prohibition from several disparate constitutional provisions on the Legislature's authority to enact retroactive laws.  However, it is important to read *Laboree* in context.  The legislation in question there was markedly different from the statute at issue here.  *See infra* ¶¶ 121-22, 125*.*  Thus, although *Laboree* anchors our vested rights jurisprudence and confirms the role of the courts in setting certain boundaries on the Legislature's constitutional authority, it in no way diminishes the significance of the framers' omission of an express constitutional prohibition against retroactive laws.

80 A.2d 866, 869 (1951) ("Established principles of constitutional construction require that the views of the framers be given great consideration . . . ."). And although the Maine Constitution has been amended numerous times since its adoption in 1820, such an express prohibition against claim revival (or other retroactive legislation in general) has never been embraced—even in 1963 when the due process clause was "updated" through the amendment adopting article I, section 6-A—despite the numerous examples from the constitutions of other states. The plain language leads to an inescapable conclusion: our Constitution does not expressly bar the Legislature from exercising its authority to enact a law reviving a claim after its statute of limitations has run.

### b. Implied Textual Basis

[¶96] Reading collectively several provisions of the text of our Constitution (principally article I, sections 1 and 6) and also reading the entire Constitution "holistically," with a concentration on certain other provisions,[50] the Court discerns a foundational "anti-retroactivity theme" as its textual basis for concluding that section 752-C(3) violates due process and therefore exceeds the legislative power to enact laws. Court's Opinion ¶¶ 19, 33. The general

---

[50] The provisions cited by the Court are Me. Const. art. I, § 1 ("Natural rights"); *id.* art. I, § 6 ("Rights of persons accused"); *id.* art. I, § 6-A ("Discrimination against persons prohibited"); *id.* art. I, § 11 ("Attainder, ex post facto and contract-impairment laws prohibited"); and *id.* art. I, § 21 ("Private property, when to be taken"). Court's Opinion ¶¶ 20-21. The Court also invokes Me. Const. art. III ("Distribution of Powers"). Court's Opinion ¶ 22.

inference drawn by the Court from these provisions is overstated and, for several reasons, neither evinces a general "constitutional hostility" to retroactive legislation, Court's Opinion ¶ 25, nor "demonstrate[s] convincingly" an implied basis for invalidating section 752-C(3), *Bouchard*, 2015 ME 50, ¶ 8, 115 A.3d 92 (quotation marks omitted).[51]

[¶97] It is well established that statutes with retrospective application are not per se unconstitutional. *See, e.g.*, *Black v. Bureau of Parks & Lands*, 2022 ME 58, ¶ 34, 288 A.3d 346 (providing that a statute may be applied retroactively "if (1) the statute is intended to apply retroactively and (2) retroactive application does not violate any provisions of the Maine Constitution"); *State v. L.V.I. Grp.*, 1997 ME 25, ¶ 9, 690 A.2d 960 ("If the Legislature intends a retroactive application, *the statute must be so applied* unless the Legislature is prohibited from regulating conduct in the intended manner, and such a limitation upon the Legislature's power can only arise from the United States Constitution or the Maine Constitution." (emphasis added and quotation marks

---

[51] Implied judicial limitations on legislative authority are disfavored. *See Me. Senate v. Sec'y of State*, 2018 ME 52, ¶ 28, 183 A.3d 749 ("Separation of powers concerns counsel a policy of judicial restraint." (alteration and quotation marks omitted)); *Sawyer v. Gilmore,* 109 Me. 169, 180, 83 A. 673, 678 (1912) ("The authority of the executive and judicial departments is a grant. These departments can exercise only the powers enumerated in and conferred upon them by the Constitution and such as are necessarily implied therefrom. The powers of the Legislature in matters of legislation, broadly speaking, are absolute, except as restricted and limited by the Constitution. As to the executive and judiciary, the Constitution measures the extent of their authority, as to the Legislature it measures the limitations upon its authority.").

omitted));[52] *see also Hastings v. Lane*, 15 Me. 134, 135 (1838) (noting that the "settled rule" is that a statute "is not to have a retrospective effect . . . unless the intention to have it operate retrospectively is clearly expressed").

[¶98]  Further, only one of the provisions that the Court includes in its analysis—article I, section 11—is an express limitation on legislative power to enact retrospective laws.  It provides: "The Legislature shall pass no bill of attainder, ex post facto law, nor law impairing the obligation of contracts, and no attainder shall work corruption of blood nor forfeiture of estate."  The proscription against bills of attainder and ex post facto laws pertain to criminal matters, not civil cases.  *See Baker v. Town of Woolwich*, 517 A.2d 64, 69 (Me. 1987).  Article I, section 11 is limited in scope and has no applicability here.  *See also* Tinkle, *The Maine State Constitution* 54 ("[Section 11] protects people from certain types of retroactive legislation"—legislation that is "penal in

---

[52]  In *State v. L.V.I. Group*, we determined that a change in the definition of "employer" in the severance pay statute could be constitutionally applied to the parent company of a corporation that had laid off employees before the law took effect.  1997 ME 25, ¶¶ 2-17, 690 A.2d 960.  In *Tompkins v. Wade & Searway Construction Corp.*, we upheld the retroactive application of a statute altering the benefits for injuries sustained prior to the law's passage.  612 A.2d 874, 875-78 (Me. 1992).  In *Morrill v. Maine Turnpike Authority*, we upheld the retroactive application of a statute altering procedural requirements for appealing from an action by the State Claims Commission.  2009 ME 116, ¶¶ 4-8, 983 A.2d 1065.  *See also Berry v. Clary*, 77 Me. 482, 484-86, 1 A. 360, 360-61 (1885) (upholding retroactive application of a statute modifying the so-called Sunday-contract defense created before the law took effect); *Oriental Bank v. Freeze*, 18 Me. 109, 111-13 (1841) (upholding retrospective application of a statute changing the remedies available in certain instances).

66

nature. . . . Hence, the proscription against such legislation has no application to civil matters.").

[¶99]  Textually, neither article I, section 1, nor article I, section 6 speaks directly to the issue presented here.[53]  A number of our earlier cases have interpreted the broad language of these provisions to imply due process protections against certain retroactive laws, such as those affecting established property rights.  *See infra* ¶¶ 120-28.  More recently, we expressly recognized that article I, sections 1 and 6 served as "proxies for due process protections of vested rights until section 6-A was adopted in 1963."[54]  *NECEC Transmission LLC v. Bureau of Parks & Lands*, 2022 ME 48, ¶ 42, 281 A.3d 618.

---

[53]  Article I, section 1 declares that all persons have "certain natural, inherent and unalienable rights," including rights in property.  Article I, section 6 addresses the "[r]ights of persons accused," including a guarantee against being deprived of "life, liberty, property or privileges, but by judgment of that person's peers or the law of the land."  The other provision that the Court cites, article I, section 21, which proscribes taking private property for public use without just compensation, is not apt here.

[54]  Even though our earlier due process jurisprudence that was rooted in these provisions carries forward into section 6-A, the protections that the jurisprudence afforded are not necessarily greater in scope than those afforded by either section 6-A or the Fourteenth Amendment.  Article I, section 1 had been viewed "as a catchall for fundamental rights not otherwise enumerated in Article I."  Tinkle, *The Maine State Constitution* 29.  But in the modern era, the tension between rights of the individual and rights of the state has been addressed through constitutional analyses with varying levels of scrutiny, depending upon the nature of the right at issue, and subject to our established jurisprudence regarding vested rights.  Article I, section 6 principally addresses specific, enumerated rights in the context of criminal prosecutions.  Although this section was interpreted in our early cases "to signify the process and procedure established under the common law," Tinkle, *The Maine State Constitution* 44, it was not necessarily read broadly.  For example, in *Nott's Case*, 11 Me. 208 (1834), we "rejected the argument that either this section or section 1 barred a statute that authorized the commitment of a citizen to a dungeon or workhouse without trial or hearing."  Tinkle, *The Maine State Constitution* 44*.*  We subsequently overruled *Nott's Case* on the basis of the Fourteenth Amendment.  *See City of Portland v. City of Bangor*, 65 Me. 120, 121-22 (1876).  Although the "law of the land" clause in section 6 at one time was considered to have a meaning equivalent to "due process of law," *see State v. Knight*,

[¶100]  Article I, sections 1 and 6 of our Constitution parallel—in fact derive from—corresponding provisions in the Massachusetts Declaration of Rights, namely articles I, X, and XII of the latter document.  *See Laboree*, 2 Me. at 290; Tinkle, *The Maine State Constitution* 29, 38; *compare* Me. Const. art. I, § 1, *with* Mass. Const. pt. I, arts. I, X; *compare* Me. Const. art. I, § 6, *with* Mass. Const. pt. I, art. XII.  It is important to note that Massachusetts courts have not interpreted these antecedent provisions in the Massachusetts Declaration of Rights to extend due process protections to expired claims under a statute of limitations and thus to prohibit legislation retrospectively reviving those claims.

[¶101]  In *City of Boston v. Keene Corporation*, for example, the question of whether a statute retroactively reviving lapsed tort claims violated these provisions—articles I, X, and XII of the Massachusetts Declaration of Rights— was squarely addressed.  547 N.E.2d 328, 334 (Mass. 1989).  After evaluating the "nature of the right" affected and the scope of due process protections implicitly guaranteed by these provisions, the Massachusetts Supreme Judicial Court concluded that the statute's retroactive effect did not violate due process,

---

43 Me. 11, 122 (1857); *State v. Doherty*, 60 Me. 504, 509 (1872), and served as a "proxy" for due process now resident in section 6-A, it has also been observed that "the law of the land clause [in section 6] has become doubly redundant and has fallen into desuetude," *NECEC Transmission LLC v. Bureau of Parks & Lands*, 2022 ME 48, ¶ 42, 281 A.3d 618 (quoting Tinkle, *The Maine State Constitution* 45).

the statute of limitations was "procedural rather than substantive," and "the running of the limitations period on such claims *does not create a vested right*." *Id.* at 334-35 (emphasis added); *see also Sliney v. Previte*, 41 N.E.3d 732, 740-42 (Mass. 2015) (following *Keene* in holding that a statute retroactively reviving expired claims of sexual abuse of minors did not violate due process).

[¶102]  Of course, the Massachusetts Supreme Judicial Court's interpretation of the parallel provisions in its own constitution is not binding on our construction of article I, sections 1 and 6 of the Maine Constitution. But it is relevant and informative to the analysis here, and it bears upon the assessment of the extent to which principles of due process inferred from those provisions (and now enveloped in article I, section 6-A) ought to be read to invalidate section 752-C(3)'s retroactive application as an impairment of vested rights.  *See NECEC*, 2022 ME 48, ¶¶ 42, 44, 281 A.3d 618 ("Constitutional protection of vested rights properly resides in Maine's due process clause.").

[¶103]  For reasons similar to those given in *Keene* and *Sliney*, I conclude that reliance on the vested rights doctrine in this case is misplaced and that section 752-C(3)'s retrospective operation does not violate due process.  The reasons supporting this conclusion are discussed below.  Before doing so, however, I consider the additional factors comprising the primacy approach to analyzing our Constitution, *see Athayde*, 2022 ME 41, ¶¶ 20-21, 277 A.3d 387.

Taken together, these factors reinforce the conclusion that our Constitution does not negate the Legislature's authority to enact section 752-C(3)'s provision for retroactive revival of the claims at issue here.

### 2. Common Law

[¶104]  To shed light on the meaning of relevant constitutional text, we examine relevant principles reflected in the common law that may have influenced or shaped the framers' intent.  *See Atkins v. Adams*, 2023 ME 59, ¶ 20, 301 A.3d 802.  With respect to this factor, several points are noted.

[¶105]  I agree with the Court that "[l]ong before the adoption of the Maine Constitution, the common law condemned the concept of retroactive liability."  Court's Opinion ¶ 31.  As suggested above, even assuming the framers of our Constitution were cognizant of the common law's antipathy toward "retroactive liability," such an awareness did not induce them to include in our Constitution any prohibition against retroactive legislation, either in general or with specific reference to reviving expired claims.  Significantly, the nature of "retroactive liability" traditionally found to be problematic involved the creation of new personal liability where none previously existed—in other words, altering the legal significance of past actions.  A statute that retrospectively revives a lapsed claim does not do so.

[¶106]  Specifically with regard to the nature and effect of a statute of limitations, the Court cites contemporaneous cases from several other states to bolster its assertion that it was commonly accepted that "a cause of action cannot be revived after the expiration of a statute of limitations."  Court's Opinion ¶ 31.[55]  Yet, our own caselaw from around the time of Maine's founding as a state is not so definitive and suggests that statutes of limitations have "reference to the remedy only" and are "subject to modification at the pleasure of the Legislature."  *Lunt v. Stevens*, 24 Me. 534, 537 (1845); *see also Mason v.*

---

[55] The Court cites a number of Massachusetts cases to support its contention that Maine's position in "reject[ing] retrospective legislation impairing vested rights, which rights include the protection from revival of causes of action after their statutes of limitations have expired," was consistent with Massachusetts common law at the time Maine gained its independence.  Court's Opinion ¶ 29 & n.22. Some of the cases cited were decided well after Maine's separation from Massachusetts and the adoption of our Constitution.  *See, e.g.*, *Brigham v. Bigelow*, 53 Mass. (12 Met.) 268 (1847); *Darling v. Wells*, 55 Mass. (1 Cush.) 508 (1844); *Loring v. City of Bos.*, 78 Mass. (12 Gray) 209 (1858); *Bigelow v. Bemis*, 84 Mass. (2 Allen) 496 (1861); *Kinsman v. City of Cambridge*, 121 Mass. 558 (1877).  Some were decided on statutory, not constitutional, grounds.  *See Battles v. Forbes*, 36 Mass. (19 Pick.) 578 (1827) (explaining that the Massachusetts Legislature passed a law prohibiting the repeal of an act from affecting rights accrued or established thereunder); *Loring*, 78 Mass. at 211 (declining to construe a statue extending the limitations period to apply to claims litigated before its enactment). More significantly, though, less than twenty-five years after the latest of the cases cited by the Court, *Kinsman v. City of Cambridge*, 121 Mass. 558 (1877), the Massachusetts Supreme Judicial Court held that a statute retroactively reviving an expired claim was constitutional under Commonwealth law and recognized "the power of the Legislature to call a liability into being where there was none before, if the circumstances were such as to appeal with some strength to the prevailing views of justice, and if the obstacle in the way of the creation seemed small."  *Danforth*, 59 N.E. at 1034.  Moreover, at the time Maine separated from Massachusetts and our Constitution was adopted, decisions of Massachusetts courts applying conflict-of-law principles viewed statutes of limitations as remedial bars separable from the merits of the underlying cause of action in certain actions.  *See Pearsall v. Dwight*, 2 Mass. 84, 89-90 (1806); *Byrne v. Crowninshield*, 17 Mass. 55, 56 (1820); *see also Bulger v. Roche*, 28 Mass. (11 Pick.) 36, 38-39 (1831).  A statute of limitations merely cut off the availability of a remedy in the home jurisdiction but did not extinguish the underlying rights giving rise to the claim. *See Pearsall*, 2 Mass. at 87-91; *Bulger*, 28 Mass. at 39-40 ("[S]tatutes of limitation affect only the time, within which a legal remedy must be pursued, and do not affect the nature, validity, or construction of the contract.").

*Walker*, 14 Me. 163, 166-67 (1837) ("The time when an action may be commenced, is a matter not relating to the contract or title. . . . It has been decided, that the general statute of limitations operates by way of bar to the remedy and not to the right." (citations omitted)); *Oriental Bank v. Freeze*, 18 Me. 109, 112 (1841) ("[T]he legislature possessed the power to take away by statute, what was given by statute, except vested rights.").

[¶107]  Moreover, our earliest cases expressed the view that "[t]here is no such thing as a *vested right to a particular remedy*." *Thayer v. Seavey*, 11 Me. 284, 288 (1834) (emphasis added and quotation marks omitted).  In *Thayer*, the plaintiff brought an action in debt against the keeper of the jail for the escape of certain prisoners who were committed for failing to pay the plaintiff. *Id.* at 285.  While the action was pending, the Legislature enacted a statute that effectively limited the damages that the plaintiff could recover.  *Id.* at 285-86. Writing for the Court, Chief Justice Mellen rejected the plaintiff's contention that the statute's retrospective operation "is unconstitutional because it disturbs vested rights and impairs the obligation of contract," stating:

> It is a general rule, applicable to all laws, that generally they are to be considered as prospective, and not to affect past transactions.  It is not intended by this rule that the legislature cannot in some cases make laws with a *retrospective operation*; but this effect is not to be given to a statute unless such intention is manifestly expressed, especially if it tends to produce injustice or inconvenience.  In the

> case before us the act was passed to *prevent* injustice; and it should be so construed as to produce the intended effect.

*Id.* at 290 (emphasis added and quotation marks omitted).

[¶108]  Thus, our founding-era common law countenanced the notion that statutes affecting remedies could operate retrospectively without breaching constitutional limits.  *See id.*  Because statutes of limitations were viewed as affecting remedies, *see Lunt*, 24 Me. at 537, they did not give rise to vested rights.  *See Oriental Bank*, 18 Me. at 112 ("Our constitution carefully guards the right of private property, and provides, that it shall not be taken from any one, unless the public exigencies require it.  This does not, however, prohibit the legislature from passing such laws as act retrospectively, not on the right of property or obligation of the contract, but only upon the remedy which the laws afford to protect or enforce them.").

### 3.    Economic and Sociological Considerations

[¶109]  Because the Maine Constitution is "a live and flexible instrument fully capable of meeting and serving the imperative needs of society in a changing world," *Winchester*, 2023 ME 23, ¶ 24, 291 A.3d 707 (quotation marks omitted), the third factor we assess in construing our Constitution—relevant economic and sociological considerations—has particular significance here.

[¶110]  Recognizing a vested right in a statute-of-limitations defense in this case would permanently bar Dupuis and other claimants who allegedly suffered sexual abuse as children at the hands of persons with authority over them from pursuing a remedy in Maine courts.  That result would be particularly harsh given the myriad reasons why victims of childhood sexual assault may not disclose their abuse for many years.  *See supra* ¶¶ 68-69.  Moreover, some policy objectives served by a statute of limitations—such as encouraging diligence on the part of claimants and promoting prompt resolution of civil disputes—have no application here.

[¶111]  On the other side of the scale, the Bishop and the American Tort Reform Association, as amicus curiae, raise the specter of exposure to unmitigated retroactive liability and the deleterious impact this may have on insurers.  But that would not be the effect of denying the Bishop's vested rights challenge here, for several reasons.

[¶112]  First, even though the Legislature may revive previously barred claims, it may not enact laws that impose new liability for past conduct.  It is well established that the "[s]ubstantive rights of the parties are fixed at the date upon which the cause of action accrued."  *Batchelder v. Tweedie*, 294 A.2d 443, 444 (Me. 1972).  There is no dispute that the Legislature lacks "power to enact retrospective laws which . . . create [new] personal liabilities."  *Coffin v. Rich*,

45 Me. 507, 514-15 (1858); *see also Miller v. Fallon*, 134 Me. 145, 147-48, 183 A. 416, 417 (1936); *Thut v. Grant*, 281 A.2d 1, 6 (Me. 1971). The enactment of section 752-C(3), however, did not create a new liability. It simply removed the bar against filing a lawsuit that seeks to establish liability for past conduct. The standard for determining liability, if any, is entirely different and will be based on the substantive law in effect at the time the conduct occurred. Section 752-C(3) neither alters the standard of liability in effect at the time nor dictates the outcome. Its effect is to allow the case to proceed.

[¶113]   Second, in the last three decades, the Legislature already extended, then eliminated altogether, the statute of limitations for claims alleging sexual acts toward minors, covering all but a finite class of additional, prospective claimants whose numbers will only diminish with time. *See supra* ¶¶ 71-73. Underwriting adjustments to insurance coverages and premiums have likely already been made. Section 752-C(3)'s retroactive effect, therefore, is likely far less dramatic than the Bishop posits.

[¶114]   Moreover, the effect of the Court's holding is not just to confer absolute, constitutionally protected immunity on some, including the Bishop, it undermines another right enshrined in our Constitution for others, including Dupuis and the other plaintiffs here. Article I, section 19 provides:

> Every person, for an injury inflicted on the person or the person's reputation, property or immunities, shall have remedy by due course of law; and right and justice shall be administered freely and without sale, completely and without denial, promptly and without delay.

This provision, which derives from the Massachusetts Constitution of 1780 with roots going back to the Magna Carta, affords a guarantee that "for every wrong there shall be a legal remedy." Tinkle, *The Maine State Constitution* 58.

[¶115] Admittedly, we previously have upheld statutes of limitation as a "reasonable procedural requirement[ ] for exercising the right to adjudication" and rejected constitutional challenges based on article I, section 19. *Godbout v. WLB Holding, Inc.*, 2010 ME 46, ¶¶ 6-8, 997 A.2d 92 (quotation marks omitted). That is not the issue. I do not question the principle espoused in *Godbout*. The question here is not whether a duly enacted statute of limitations is constitutional. Rather, the question is whether the Constitution bars the Legislature from reviving a claim after rebalancing competing policies in light of an evolved understanding of the dynamics of childhood sexual abuse that may have prevented victims from asserting their claims earlier.[56]

---

[56] The Court cites *Choroszy v. Tso*, 647 A.2d 803 (Me. 1994), to bolster its position that article I, section 19's guarantee of a remedy for every injury does not trump a statute-of-limitations defense, positing that *Choroszy* joins a "long list of Maine decisions" concluding that freedom from liability after the expiration of a limitations period is a substantive right protected by constitution. Court's Opinion ¶ 28. *Choroszy* held that the three-year limitations period for discovering an injury was not unconstitutionally unreasonable. *Id.*

### 4.    Decisions of Other Courts

[¶116]  A fourth factor we consider in our analysis is relevant persuasive authority from other jurisdictions that may be useful in interpreting our Constitution.  As noted above, in some jurisdictions the state constitution expressly prohibits laws that operate retrospectively, either generally or specifically to the revival of claims.[57]   Thus, for purposes of this factor, the relevant comparison is with decisions from jurisdictions whose constitutions do not have such express prohibitions.

[¶117]  Courts in approximately twenty-five other states, as well as the Supreme Court, have considered whether the revival of claims previously barred by a statute of limitations is *impliedly* prohibited by their respective

---

As discussed above, I agree that our Constitution does not bar the Legislature from "erect[ing] reasonable procedural requirements for exercising the right to an adjudication." *Godbout v. WLB Holding, Inc.*, 2010 ME 46, ¶ 7, 997 A.2d 92 (quotation marks omitted).  However, that is not tantamount to saying that an expired period of limitations extinguishes a plaintiff's claim entirely or vests a constitutionally protected right in a defendant to be forever free from suit. *See State v. Tucci*, 2019 ME 51, ¶¶ 12-13 & n.2, 206 A.3d 891 (noting that, unless a statute "reflects [a] legislative objective to give a defendant a complete defense to any suit after a certain period," a statute of limitations limits the time for bringing a claim and does not "extinguish" the claim (quotation marks omitted)).  Moreover, the "long list of Maine decisions" referenced by the Court are all distinguishable from the circumstances presented here, for the reasons I discuss.

[57]    The constitutions of Alabama, Colorado, Georgia, Missouri, New Hampshire, Oklahoma, Tennessee, and Texas expressly prohibit all retroactive legislation. *See supra* n.47.  In each of those states, except Georgia, courts have held that laws purporting to revive claims previously barred by a statute of limitations were unconstitutional. *See Johnson v. Garlock, Inc.*, 682 So. 2d 25, 28 (Ala. 1996); *Jefferson Cnty. Dep't of Soc. Servs. v. D. A. G.*, 607 P.2d 1004, 1006 (Colo. 1980); *Doe v. Roman Cath. Diocese of Jefferson City*, 862 S.W.2d 338, 341 (Mo. 1993); *Gould v. Concord Hosp.*, 493 A.2d 1193, 1195–96 (N.H. 1985); *Wright v. Keiser*, 568 P.2d 1262, 1267 (Okla. 1977); *Ford Motor Co. v. Moulton*, 511 S.W.2d 690, 695-97 (Tenn. 1974); *Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 4-5 (Tex. 1999). *But see Canton Textile Mills, Inc. v. Lathem*, 317 S.E.2d 189, 193 (Ga. 1984).  As discussed, the Maine Constitution contains no such express provision.

constitutions. These courts are split. Currently, no fewer than fifteen jurisdictions hold that the revival of expired claims is permitted;[58] ten hold that the retroactive revival of previously barred claims is impliedly prohibited by their respective constitutions.[59]

[¶118] It appears, therefore, that the majority of courts that have considered whether their respective constitutions *impliedly* prohibit the retroactive revival of claims previously barred by the statute of limitations answer that question in the negative. Some of these decisions rest, to one degree or another, on the same ground that I conclude is dispositive—one does not have a vested right in the continued existence of a rule of procedure or

---

[58] *See Chevron Chem. Co. v. Super. Ct.*, 641 P.2d 1275, 1282-84 (Ariz. 1982); *Liebig v. Super. Ct.*, 257 Cal. Rptr. 574, 578 (Cal. Ct. App. 1989); *Doe v. Hartford Roman Cath. Diocesan Corp.*, 119 A.3d 462, 494-518 (Conn. 2015); *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1258-60 (Del. 2011); *Peterson v. Peterson*, 320 P.3d 1244, 1250 (Idaho 2014); *Harding v. K.C. Wall Prods., Inc.*, 831 P.2d 958, 967-69 (Kan. 1992); *City of Bos. v. Keene Corp.*, 547 N.E.2d 328, 334-35 (Mass. 1989); *Pryber v. Marriott Corp.*, 296 N.W.2d 597, 600 (Mich. Ct. App. 1980), *aff'd*, 307 N.W.2d 333, 333 (Mich. 1981); *Donaldson v. Chase Sec. Corp.*, 13 N.W.2d 1, 5 (Minn. 1943), *aff'd*, 325 U.S. 304, 311-16 (1945); *Cosgriffe v. Cosgriffe*, 864 P.2d 776, 778-79 (Mont. 1993); *S.Y. v. Roman Cath. Diocese of Paterson*, No. 20-CV-02605, 2021 WL 4473153, at *5-8 (D.N.J. Sept. 30, 2021); *PB-36 Doe v. Niagara Falls City Sch. Dist.*, 182 N.Y.S.3d 850, 851-53 (N.Y. App. Div. 2023); *McKinney v. Goins*, 892 S.E.2d 460, 467-80 (N.C. Ct. App. 2023); *In re W.M.V.*, 268 N.W.2d 781, 786-87 (N.D. 1978); *A.B. v. S.U.*, 298 A.3d 573, 578-79 (Vt. 2023); *see also Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 311-16 (1945).

[59] *See Johnson v. Lilly*, 823 S.W.2d 883, 885 (Ark. 1992); *Wiley v. Roof*, 641 So. 2d 66, 67-69 (Fla. 1994); *Thompson v. Killary*, 683 S.W.3d 641, 647-49 (Ky. 2024); *Doe A. v. Diocese of Dallas*, 917 N.E.2d 475, 482-86 (Ill. 2009); *Givens v. Anchor Packing, Inc.*, 466 N.W.2d 771, 773-75 (Neb. 1991); *Kelly v. Marcantonio*, 678 A.2d 873, 883-84 (R.I. 1996); *Doe v. Crooks*, 613 S.E.2d 536, 538 (S.C. 2005); *Minn. ex rel. Hove v. Doese*, 501 N.W.2d 366, 368-71 (S.D. 1993); *Mitchell v. Roberts*, 469 P.3d 901, 902-14 (Utah 2020); *Kopalchick v. Cath. Diocese of Richmond*, 645 S.E.2d 439, 440-43 (Va. 2007).

78

remedy that could apply in some future case.[60]  *See also Berry v. Clary*, 77 Me. 482, 484-86, 1 A. 360, 360-61 (1885); *Thut*, 281 A.2d at 6; *Miller*, 134 Me. at 147-48, 183 A. at 417; *Coffin*, 45 Me. at 514; *Oriental Bank*, 18 Me. at 111-12.

## D.    The Vested Rights Doctrine

[¶119]    The vested rights doctrine is the lynchpin of the Court's constitutional analysis and holding in this case.  Relying on the *Laboree* case and

---

[60]  *See Liebig*, 257 Cal. Rptr. at 576 ("[S]tatutes of limitations in civil matters are procedural, not substantive."); *Doe*, 119 A.3d at 502 ("[S]tatutes of limitation are presumed to apply retroactively, insofar as they are typically considered procedural, rather than substantive, legislation; thus, unless specifically tied to a statutory right of action or unless a contrary legislative intent is expressed, the statute of limitations in effect at the time an action is filed governs the timeliness of the claim." (quotation marks omitted)); *Sheehan*, 15 A.3d at 1259 ("Under Delaware law, [a statute reviving previously barred claims] can be applied retroactively because it affects matters of procedure and remedies, not substantive or vested rights."); *Peterson*, 320 P.3d at 1250 ("[S]tatutes of limitations involve matters of remedy, not destruction of rights." (quotation marks omitted)); *Harding*, 831 P.2d at 969 ("[A] defendant has no vested right in a statute of limitations.  It is an expression of legislative public policy, is procedural, and may be applied retroactively when the legislature expressly makes it so."); *Keene Corp.*, 547 N.E.2d at 335 ("We have held that, in cases not involving claims to real property, the running of the applicable limitations period bars only the legal remedy, while leaving the underlying cause of action unaffected.  Consequently, the running of the limitations period on such claims does not create a vested right which cannot constitutionally be taken away by subsequent statutory revival of the barred remedy." (citations omitted)); *Pryber*, 296 N.W.2d at 600 ("The right to defeat a claim by interposing a statute of limitations is not a vested right.  The right to defeat a claim by the interposition of a statute of limitations is a right which may be removed by the Legislature."); *Donaldson*, 13 N.W.2d at 4 (explaining that statutes of limitations that "merely take away or suspend certain remedies or forms of action, but leave the property rights of the parties unaffected" are "an exemption from the servitude of certain forms of action" not "means of the acquisition of title," and therefore "the legislature would have a perfect right to restore the remedy already barred, because it would not take away any vested rights of property" (quotation marks omitted)); *Cosgriffe*, 864 P.2d at 779 (explaining that the legislature may "extend the statute of limitations and apply it retroactively to reverse barred claims" because "[t]here are no constitutional or statutory obstacles to legislative enactments of statutes relating to remedies that are retroactive in operation"); *McKinney*, 892 S.E.2d at 470 ("[N]o claim to or interest in property invariably stems from a defendant's reliance on the procedural bar provided by the statute of limitations, and thus no vested right is impacted when that bar is lifted."); *A.B.*, 298 A.3d at 578-79 ("Because a limitations statute is a legislated bar to a remedy and does not create a right to be free of suit, the expired limitations period does not endow a tortfeasor with a 'vested right' subject to the protections of Article 4 of the Vermont Constitution.  The Legislature created the time limit on the remedy in the first place and can remove that limit without violating Article 4.").

its lineage up through *NECEC*, the Court concludes that the Bishop acquired a vested right in immunity from suit when the former statute of limitations expired because the Legislature is wholly without power to revive such a claim retroactively. I disagree.

### 1. Vested Rights Jurisprudence

[¶120] Our decision in *NECEC* chronicles the history of the vested rights doctrine, beginning with the cases of *Laboree* and *Lewis v. Webb*, 3 Me. 326 (1825), both of which are cornerstones of the Court's reasoning here. Each of these cases—as well as *Coffin* and subsequent decisions drawing upon them—involved rights of an entirely different nature than what is at issue here.

[¶121] *Laboree* considered the validity of a statute that would have retroactively changed the meaning of the common law doctrine of disseisin. 2 Me. at 287. We held that

> so far as [the statute] is retrospective, and has altered the common law, it is unconstitutional, and cannot be carried into effect; because such operation would impair and destroy vested rights, and deprive the owners of real estate of their titles thereto, by changing the principles and the nature of those facts, by means of which those titles had existed and been preserved to them in safety.

*Id.* at 295 (emphasis omitted).

[¶122] At stake in *Laboree* was *title to real property*. The effect of the statute's retrospective application was to "deprive *the owners of real estate of*

*their titles thereto*." *Id.* (emphasis added). The statute had the effect of retroactively "*altering the common law*, as to the doctrine of disseisin," and thereby changing the elements of the common law that fixed rights *in property*. *Id.* at 287 (emphasis added). *Laboree* held that our Constitution[61] "guard[s] against the retroactive effect of legislation upon *the property of the citizens*." *Id.* at 290 (emphasis added).

[¶123] *Lewis* was decided two years later. The question addressed in *Lewis* was "can the legislature, by a mere resolve, set aside a judgment or decree of a Judicial Court, and render it null and void?" 3 Me. at 332. Relying on *Laboree*, we held that a final judicial decree settling all matters in the administration of a decedent's estate established "legal title to all claiming under it, or beneficially interested in" property distributed pursuant to the

---

[61] As noted above, *see supra* n.50, because the Constitution does not expressly prohibit retroactive laws, *Laboree* implied such a prohibition from several provisions, including article I, section 1, to which it gave special emphasis as protecting property rights:

> The provisions in our constitution relating to this subject are the following.
>
> The *first* is contained in the first article of our declaration of rights and the first section.—This section, among other things, secured to each citizen the right of "*acquiring, possessing, and protecting* property, and pursuing and obtaining safety and happiness." By the spirit and true intent and meaning of this section, every citizen has the right of "possessing and protecting property" according to the *standing laws* of the state in force *at the time of his acquiring it*, and *during the time* of his continuing to possess it. . . . The design of the framers of our constitution, it would seem was, by the part of the section quoted above, to guard against the retroactive effect of legislation upon the property of the citizens.

2 Me. at 290.

court's judgment. *Id.* at 335. *Lewis* explained that "disturbance of such decree would necessarily endanger and perhaps destroy the vested rights of heirs or creditors, in that sum," and therefore a legislative resolve purporting to alter the judgment retrospectively would have "impair[ed], defeat[ed] or destroy[ed] vested rights [and] is void." *Id.* The "vested rights" at issue were property rights secured by a final judicial decree.[62] *Id.*

[¶124]   In *Coffin*, decided thirty-three years after *Lewis*, we held that legislation retroactively making individual shareholders personally liable for corporate debts was unconstitutional because it established an entirely new personal liability where none previously had existed. 45 Me. at 514-15. The statute at issue in *Coffin* permitted a third-party creditor to collect corporate debt obligations from individual shareholders even though there was no previous basis for such liability. We said:

> There can be no doubt that Legislatures have the power to pass retrospective statutes, if they affect remedies only. Such is the well

---

[62] The Court points to our reliance on "authority relating to the expiration of limitation periods" in *Lewis v. Webb*, 3 Me. 326 (1825), to support its generalization that "to constitute a proper exercise of legislative power, a law must, in its nature be general and prospective." Court's Opinion ¶ 27 (quotation marks omitted). This is an overreading of *Lewis*. Our holding in *Lewis* is simply that the Legislature lacks authority to exercise judicial powers and thereby disturb by special resolve a final adjudication. In *Holden v. James*, 11 Mass. 396 (1814), the sole authority on which *Lewis* relied for this proposition, the Massachusetts General Court (the legislature) acted to suspend a statute of limitations, but with the intention that its action apply only to one individual's case. *Id.* at 405-06. The court explained, "There is no doubt the legislature may suspend a law," including the statute of limitations, "whenever they shall think it expedient." *Holden*, 11 Mass. at 405; *see Webb*, 3 Me. at 336. However, because the statute purportedly suspended remained generally "in full force," the court held that the legislature may not suspend the operation of a law as to one individual while leaving it in effect for everyone else. *Holden*, 11 Mass. at 403, 405-06.

settled law of this State.  But they have no constitutional power to enact retrospective laws which impair vested rights, *or create personal liabilities*.

*Id.* at 514-15 (emphasis added).

[¶125]   The trilogy of *Laboree*, *Lewis*, and *Coffin* constitute the foundational cases that define the nature and scope of constitutionally protected vested rights.  As they held, the Legislature is without constitutional authority to retroactively burden or impair property rights (*Laboree*), interfere with rights secured by a final judicial decree (*Lewis*), or create a new liability based on past conduct where none previously existed (*Coffin*).  Subsequent cases addressing *constitutionally protected* vested rights have adhered closely to the principles, and remained within the parameters, that these cases established.

[¶126]  In *Adams v. Palmer*, for example, we held that a widow's common law right to recover a freehold estate upon her husband's death was a vested right—a *property right* protected under article I, section 6—that could not be voided by retroactive legislation.  51 Me. 480, 490-93 (1863).  We emphasized that

> [a] widow to whom dower has been assigned is thereby seized of a freehold estate.  Before its assignment, it is a vested right to recover a freehold; differing from a vested right to recover an estate in fee, of which one has been disseized, mainly in the lesser interest at stake.  One is as much property as the other.  Both are alike entitled

to the protection which the constitution guaranties to the PROPERTY of the citizen.

*Id.* at 490. Although the right recognized in *Adams* was "different from the one we identified in *Laboree*," *NECEC*, 2022 ME 48, ¶ 40, 281 A.3d 618, it was nonetheless a property right established under the common law. Citing *Laboree*, we noted that "[t]hese general principles, denying the power of the Legislature to take away vested rights from one and transfer them to another, have likewise received the deliberate and repeated approval of this Court . . . ." *Adams*, 51 Me. at 493; *see also Sabasteanski v. Pagurko*, 232 A.2d 524, 525-26 (Me. 1967) (holding as unconstitutional the retrospective application of a statute purporting to cure defective deeds because it interfered with established property rights).

[¶127] *Atkinson v. Dunlap* addressed a statute enacted by the Legislature that authorized the filing of a new petition in a trespass action already adjudicated and in which final judgment had entered years earlier. 50 Me. 111, 114-18 (1862). We noted that while "the Legislature has constitutional jurisdiction over remedies[,] . . . after all existing remedies have been exhausted and rights have become permanently vested, all further interference is prohibited." *Id.* at 116. As in *Lewis*, rights secured by final adjudication are vested rights.

[¶128]  *Thut v. Grant* addressed retroactive application of the newly enacted Uniform Act on Paternity, which "for the first time grant[ed] direct rights to the minor child and impose[d] a new and direct liability upon one shown to be the father." 281 A.2d at 6. We noted that "the Legislature has full power and authority to regulate and change the form of remedies in actions if no vested rights are impaired or personal liabilities created." *Id.* (emphasis and quotation marks omitted). Because no such liability existed previously, the new statute created a new personal liability and therefore could not be applied retrospectively. *Id.* at 6-7.

[¶129]  Like *Adams,* our most recent "vested rights" case, *NECEC*, applied this doctrine in a new context—but one fully consistent with our jurisprudence. In *NECEC*, we held that a developer who had been issued a valid construction permit and had undertaken substantial construction in reliance thereon had "acquired a *cognizable property right* that the Maine Constitution protects from being impaired by retroactive legislation." 2022 ME 48, ¶ 44, 281 A.3d 618 (emphasis added); *cf. Sahl v. Town of York*, 2000 ME 180, ¶¶ 12-14, 760 A.2d 266 (holding that, in the municipal zoning context, the right to continue construction vests once a developer with a validly issued, final permit undertakes significant construction in good faith).

[¶130]  Although *NECEC* stated somewhat broadly that the "property" protected by the vested rights doctrine may include "everything to which a [person] may attach a value and *have a right*," this formulation still leaves the question of what constitutes "a right," and, more importantly, would appear to extend beyond the holding of the case itself—that there existed in *NECEC* a "cognizable property right."  2022 ME 48, ¶ 44, 281 A.3d 618 (emphasis added and quotation marks omitted).

[¶131]  *NECEC's* holding, therefore, is consistent with the principles articulated by *Laboree* and its lineage and does not extend such a "right" as far as the Court does here.  Section 752-C(3)'s retrospective operation does not affect a property right or a right secured by final judgment.  Nor does its operation retroactively alter existing common law or create a new personal liability based upon past conduct where none previously existed.  *See, e.g.*, *Dalton v. McLean*, 137 Me. 4, 7, 14 A.2d 13, 15 (1940) (holding that "[a retroactive statute that] imposes a new liability . . . does not merely remove a bar to a remedy such as is interposed by the statute of limitations, which, if withdrawn by the repeal of the statute, would allow an action to be maintained for the original cause" (quotation marks omitted)).

[¶132]  As the Supreme Court recognized, statutes of limitations "are by definition arbitrary" and "represent a public policy about the privilege to

litigate. Their shelter has never been regarded as . . . a 'fundamental right.'" *Donaldson*, 325 U.S. at 314. They reflect legislative policy judgments about when claims should be brought, and these judgments involve an imprecise balancing of interests informed by notions of fairness and prevailing norms at a given point in time. *Id.* ("The history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control."). They do not confer a vested, cognizable property right.

[¶133] We, too, previously have considered statutes of limitations as "laws of process . . . deemed to operate on the remedy only," noting that "[t]here is no constitutional inhibition against the enactment of retroactive legislation which affects remedies only." *Miller*, 134 Me. at 147-48, 183 A. at 417; *see also Myrick*, 444 A.2d at 995 ("It must be recognized that the interests secured by a statute of limitations are procedural in nature and cut against those interests provided by a full and uniform application of rules of substantive law and the adjudication of cases on the merits.").

[¶134] And, we also have rejected the notion that there is a vested right in a rule of procedure or remedy that could have benefitted a defendant in the abstract. *Thut*, 281 A.2d at 6 ("It is firmly established that there is no vested right in any particular mode of procedure or remedy, and it is a general rule that, where a statute giving a particular remedy is unqualifiedly repealed, the

remedy is gone." (quotation marks omitted)); *Coffin*, 45 Me. at 514 ("There can be no doubt that Legislatures have the power to pass retrospective statutes, if they affect remedies only."); *see also Oriental Bank*, 18 Me. at 111-13 (holding that the Legislature did not "deprive the plaintiffs of any vested right" when it passed a law "changing the remedy" for breach of bond but not "destroy[ing] the right of action").

[¶135]  Put differently, statutes of limitations offer a procedural, affirmative defense that a defendant may assert if available at the time and timely raised—not a vested right of constitutional dimension.  The shelter they offer may be waived if not timely asserted, *see Schindler v. Nilsen*, 2001 ME 58, ¶ 17 n.7, 770 A.2d 638 (stating that "[a] statute of limitations defense is an affirmative defense which is not preserved unless asserted in a timely manner"), and may also be defeated by equitable considerations, *see Hanusek v. S. Me. Med. Ctr.*, 584 A.2d 634, 636 (Me. 1990) (recognizing that estoppel may be used to "bar the statute of limitations defense from being raised").[63]

[¶136]  Even when a rule of procedure could have provided a defendant with complete immunity, it does not give rise to a vested property right.

---

[63]  We recently held that even a criminal defendant can waive the statute-of-limitations defense, notwithstanding the rule that "the State generally has the burden to disprove a statutory defense that is generated by the evidence."  *State v. Thistle*, 2024 ME 6, ¶ 15, 312 A.3d 1273 (citing 17-A M.R.S. § 101(1) (2024) and *State v. Lacourse*, 2017 ME 75, ¶ 11, 159 A.3d 847).

88

*See Berry*, 77 Me. at 484-86, 1 A. at 360-61 (holding that defendant did not have a vested right in a rule that previously prevented plaintiff from enforcing a contract made on Sunday); *Thut*, 281 A.2d at 4-6 (holding that putative father did not have a vested right in procedural rules previously applicable to paternity suits, even though application of those rules would have been "fatal to the attempted prosecution of complainant's case").

[¶137] In sum, section 752-C(3) simply removes a legislatively established procedural bar that blocked Dupuis and other plaintiffs from advancing their claims. The running of the previously applicable statute of limitations did not confer a vested right of the kind we previously have recognized as meriting constitutional protection.[64] The removal of that bar by duly considered legislative action based on a rebalancing of competing interests does not infringe a vested constitutional right to be free from the obligation to defend against stale claims. *Cf. Berry*, 77 Me. at 484-86, 1 A. at 360-61; *Thut*, 281 A.2d at 4-6. And other defenses the Bishop may have, including any related to the age of the claim, remain intact.

---

[64] Similarly, other states have rejected the notion that the expiration of a statute of limitations confers a vested right to immunity from defending a claim for damages based on sexual abuse of a minor. *See, e.g.*, *A.B.*, 298 A.3d at 581; *Sliney v. Previte*, 41 N.E.3d 732, 740-42 (Mass. 2015); *Doe*, 119 A.3d at 516-18; *Sheehan*, 15 A.3d at 1258-59; *W.F. v. Roman Cath. Diocese of Paterson*, No. 20-7020, 2021 WL 2500616, at *3 (D.N.J. June 7, 2021); *Deutsch v. Masonic Homes of Cal., Inc.*, 80 Cal. Rptr. 3d 368, 380 (Cal. Ct. App. 2008); *Cosgriffe*, 864 P.2d at 778-79. *But see Thompson*, 683 S.W.3d at 647-48; *Mitchell*, 469 P.3d at 912-13.

## 2.    Prior Statute-of-Limitations Decisions

[¶138]  We have not, as the Court says, "declared many times that a claim cannot be revived after the expiration of its statute of limitations," Court's Opinion ¶ 11, in the context of circumstances presented in this case.  The cases upon which the Court (and the Bishop) rely to support this assertion— principally *Dobson v. Quinn Freight Lines, Inc.*, 415 A.2d 814 (Me. 1980), and cases citing *Dobson*—are factually and legally distinguishable.  Statements from those cases concerning rights vesting upon expiration of a statute of limitations are purely dicta, and "a dictum is not precedential—it is neither authoritative nor binding."  *Franchini v. Investor's Bus. Daily, Inc.*, 2022 ME 12, ¶ 46, 268 A.3d 863 (Hjelm, A.R.J., dissenting).   Although it may be accorded "respectful consideration," dictum is not entitled to authoritative precedential value.[65]  *In re O'Donnell's Express*, 260 A.2d 539, 545 (Me. 1970); *see also State v. Murphy*, 2010 ME 28, ¶ 20, 991 A.2d 35 ("General expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.  If they go beyond the case, they may be respected, but ought not to control the

---

[65]  The Court concedes that it relies primarily upon dicta to support the contention that we have "already addressed the issue presented."  Court's Opinion ¶¶ 12, 14.  It argues that it must rely on dicta because the Legislature has never dared to enact a law like section 752-C(3) before.  Court's Opinion ¶ 14.  But, as just noted, we have twice considered whether the retroactive elimination of an affirmative defense like the statute of limitations here impairs a vested right and held both times that it does not.  *See Berry*, 77 Me. at 484-86, 1 A. at 360-61 (holding that the Legislature may retroactively eliminate the "Sunday-contract" defense); *Thut v. Grant*, 281 A.2d 1, 4-6 (Me. 1971) (holding that the Legislature may retroactively eliminate certain procedural requirements in paternity suits).

judgment in a subsequent suit, when the very point is presented for decision." (alteration and quotation marks omitted)).

[¶139]  In *Dobson,* we considered whether the Workers' Compensation Commission erred in applying the statute of limitations in effect at the time of the employee's original injury to preclude a later petition for additional benefits due to reinjury rather than the extended limitations period subsequently enacted by the Legislature and in effect at the time the employee filed the second petition*.*  415 A.2d at 815-17.  We concluded that the subsequently enacted extension of the limitations period applied because it did not "have the effect of changing the legal significance of prior events or acts," did not "enlarge or diminish any substantial right of the employee," and affected only the procedure for enforcing the claims arising from the prior events or acts.  *Id.* at 815-16.

[¶140]  In reaching this conclusion in *Dobson*, we noted:

Legislation which lengthens the limitation period on existing viable claims does not have the effect of changing the legal significance of prior events or acts.  It does not revive an extinguished right or deprive anyone of vested rights.  No one has a vested right in the running of a statute of limitations until the prescribed time has completely run and barred the action.

*Id.* at 816.  Because the "prescribed time" had not run, we did not rule on whether those facts would have given rise to a vested right.  *Id.*  The statement

that "[n]o one has a vested right in the running of a statute of limitations until the prescribed time has completely run and barred the action" is dictum, not integral to *Dobson's* holding. *Id.*

[¶141] Therefore, *Dobson* neither presented nor addressed an issue of vested rights in the context of a constitutional question of due process. Likewise, none of the cases following *Dobson* cited by the Bishop and the Court involved the constitutional vested rights doctrine; and similar references in those cases to rights vesting upon expiration of a statute of limitations are also dicta.[66]

[¶142] Moreover, *Dobson* and its progeny involve another critical difference that diminishes their persuasive force here—they all involved statutes of limitation embedded in a comprehensive statutory scheme (there, the workers' compensation statute) that both created the specific rights or benefits and limited their duration:

---

[66] For example, it is true, as the Court notes, that in *Morrissette v. Kimberly-Clark Corporation*, we said amendments "may be applied retroactively to extend the statute of limitations, but *not* to revive cases in which the statute of limitations has expired" because "[e]xpiration of the statute of limitations . . . results in a final disposition of the case." 2003 ME 138, ¶ 15, 837 A.2d 123. However, *Morrisette* did not involve a claim that was previously barred by the statute of limitations. The question in that case was whether an amendment to the workers' compensation statute could be applied to alter a previous benefits calculation made under an earlier version of the statute. *Id.* ¶ 1. *Morrissette* concluded that it could because "the level of an employee's prospective benefits is never final." *Id.* ¶ 15; *see also Dahms v. Osteopathic Hosp. of Me.*, 2001 ME 145, ¶ 12, 782 A.2d 774; *Rutter v. Allstate Auto. Ins. Co.*, 655 A.2d 1258, 1259 (Me. 1995); *Danforth v. L.L. Bean, Inc.*, 624 A.2d 1231, 1232 (Me. 1993). None of these cases directly address the issue before us in this case.

> [T]here is a significant distinction between a statute of limitations and a statute such as the present one which creates a special right of action for the benefit of a lien claimant. The former is available as an affirmative defense, is not jurisdictional and can be waived. The statute presently under consideration is one which creates a special right which was unknown to the common law. The Legislature saw fit to provide that this right should exist only during a limited period and the Court is without jurisdiction to entertain such an action as this when the period of its availability has expired.[67]

*Bellegarde Custom Kitchens v. Leavitt*, 295 A.2d 909, 912 (Me. 1972) (citations omitted); *see also Coffin*, 45 Me. at 512 ("*[I]f the right itself was created by statute*, and existed only by virtue of its provisions, then the repeal of the statute defeats the right itself, *unless already vested by a judgment.*" (emphasis added)). The statutory scheme that conferred a benefit or right "unknown to the common law" simultaneously established limitations upon that right, including temporal limitations. Once beyond the period of limitations, the right conferred by statute ceased to exist and therefore was extinguished. *Cf. State v. Tucci*, 2019 ME 51, ¶¶ 1, 11-12 & n.2, 206 A.3d 891 (holding that a statute both

---

[67] The Court's quotation from *Bellegarde*—that a "statute of limitations is a matter of substance," Court's Opinion n.29—is taken out of context. The language in the text quoted above from *Bellegarde* directly follows the language quoted by the Court, and thus makes clear the "significant distinction" between limitations periods embedded in, and coupled with, a statutory conferral of a specific benefit or right "unknown to the common law" and statutes of limitations generally, which establish a waivable, procedural defense. *Bellegarde Custom Kitchens v. Leavitt*, 295 A.2d 909, 912 (Me. 1972). The Court's reference to *Hebron Academy, Inc. v. Town of Hebron*, 2013 ME 15, ¶ 29, 60 A.3d 774, is also inapposite. *Hebron* quoted that language from *Bellegarde* in support of the proposition that a dismissal of an action based on the statute of limitations constituted, "for res judicata purposes," a disposition on the merits. *Id.*

creating a cause of action for fraudulent transfer and limiting the time for bringing the action "reflects the legislative objective to give a defendant a complete defense to any suit after a certain period" (quotation marks omitted)). In other words, "the legislature possesse[s] the power to take away by statute, what was given by statute." *Oriental Bank*, 18 Me. at 112.

[¶143] What is at issue here is not a statutorily created (and limited) benefit or right but rather a cause of action arising under common law. And, unlike a statutorily created right, "[a]t common law, an individual has a vested right in an accrued cause of action, and a subsequent statutory enactment cannot act to defeat retroactively such a cause of action." *Heber v. Lucerne-in-Maine Vill. Corp.*, 2000 ME 137, ¶ 10, 755 A.2d 1064. The Legislature merely interposed an arbitrary time period as an affirmative defense to promote a policy of timely resolution of claims.[68]

---

[68] The Court cites similar dicta in several other cases that did not involve statutorily created rights with associated limitations periods, Court's Opinion ¶ 13, but those cases, too, do not support the assertion that we have already decided the issue presented in this case. *See, e.g.*, *Atkinson v. Dunlap*, 50 Me. 111 (1862); *Angell v. Hallee*, 2014 ME 72, ¶ 6, 92 A.3d 1154; *Heber v. Lucerne-in-Maine Vill. Corp.*, 2000 ME 137, ¶ 12, 755 A.2d 1064; *L.V.I. Grp.*, 1997 ME 25, ¶¶ 4-17 & n.4, 690 A.2d 960; *White v. Jordan*, 27 Me. 370 (1847). *Atkinson* is inapposite. In *Atkinson,* the underlying right at issue was a final judgment in a trespass claim. 50 Me. at 113-14. We held, as we did in *Lewis*, that the Legislature could not retroactively disturb a matter that already had been reduced to final judgment. 50 Me. at 114-18. In *Angell,* an alleged victim of childhood sexual abuse filed a claim beyond the time permitted by the statute of limitations in effect at the time of the alleged abuse but pursuant to a newly extended period of limitations. 2014 ME 72, ¶¶ 3-6, 92 A.3d 1154. The statute extending the limitations period was not retroactive. *Id.* ¶ 6 n.6. The question turned on whether the prior statute of limitations had tolled sufficiently to allow plaintiff to come within the extended limitations period. *Id.* ¶ 6. *Heber* is also distinguishable. In *Heber,* the Legislature enacted a law that "had the effect of entirely eliminating a cause of action that existed at the time Heber suffered the damages he now alleges." 2000 ME 137, ¶ 12, 755 A.2d 1064. Consistent with the principle announced first in the *Laboree* case,

## E.  Applicable Standard

[¶144]  It is unsurprising that there are divided perspectives on the nature and effect of section 752-C(3)'s retrospective operation.  Previously we have "acknowledge[d] that the opinions of this Court, written over a period of years, admit of divergent analytic approaches on the question of retroactive application of statutes."  *Norton v. C.P. Blouin, Inc.*, 511 A.2d 1056, 1060 (Me. 1986).  These "divergent approaches" result from dueling characterizations of a statute or its effects as either "purely procedural or remedial in nature" or "effect[ing] a substantive change"—that is, "determin[ing] the legal significance of operative events occurring prior to its effective date by impairing rights or creating liabilities."  *Id.* at 1060 n.5.  Even in the latter case, though, a retroactive law that "readjust[s] rights and burdens" or "upsets otherwise settled expectations" is not unlawful, *L.V.I.*, 1997 ME 25, ¶ 10, 690 A.2d 960 (quotation marks omitted), if the legislative intent "is clearly expressed or necessarily implied . . . unless a specific provision of the state or

---

we held that the Legislature could not retrospectively alter a common law cause of action and extinguish an accrued cause of action.  *Id.* ¶¶ 10, 12.  *L.V.I.* did not involve a claim previously barred by the statute of limitations.  1997 ME 25, ¶¶ 4-17 & n.4, 690 A.2d 960.  Furthermore, there we upheld the retroactive operation of the statute applying the due process test discussed below.  *Id.* ¶ 16.  *White* did not involve a claim revival and stands for the proposition that, absent a legislative enactment to the contrary, the statute of limitations in effect when a claim accrues is operative.  27 Me. at 378-79.

federal constitution is demonstrated to prohibit such action by the Legislature."

*Norton*, 511 A.2d at 1060 n.5*.*

[¶145]  Here, the Legislature clearly expressed its intent, and no specific provision of the state or federal constitution prohibits it from enacting section 752-C(3).  For the reasons discussed above, the expiration of the original limitations period did not endow the Bishop with a vested right of the nature our jurisprudence has expressly recognized to date.  The test of whether section 752-C(3) violates due process guaranteed in our Constitution, therefore, does not rest in or derive from our vested rights jurisprudence.

[¶146]  Rather, the proper test of section 752-C(3)'s constitutionality is one consistent with our prior decisions assessing whether statutes that "readjust[ed] rights and burdens" comported with due process.  In *L.V.I.*, we "clarified the proper analysis concerning the retroactive application of statutes." 1997 ME 25, ¶ 9, 690 A.2d 960.

[¶147]  There, the issue was whether a statute that retroactively subjected certain employers or their affiliated entities to severance pay claims violated due process.  We reaffirmed a three-part test for determining whether the Legislature's exercise of power in enacting a retroactive statute comported with due process under article I, section 6-A of the Maine Constitution: "'1. The object of the exercise must be to provide for the public welfare.  2. The

legislative means employed must be appropriate to the achievement of the ends sought.  3. The manner of exercising the power must not be unduly arbitrary or capricious.'"  *Id.* (emphasis omitted) (quoting *Tompkins v. Wade & Searway Constr. Corp.*, 612 A.2d 874, 878 n.2 (Me. 1992)).

[¶148]  Courts in other states have applied a similar standard in precisely this context.  In *Sliney v. Previte*, the Massachusetts Supreme Judicial Court rejected a due process challenge under the commonwealth's constitution to a statute retrospectively reviving sexual-abuse-of-minors claims previously barred by the applicable statute of limitations.  41 N.E.3d at 738-39.  *Sliney* applied a test that examines three factors: "the public interest that motivated the Legislature to enact the statute, the nature of the rights affected by the retroactivity, and the scope of the impact of the statute on those rights."[69]  *Id.*; *see also PB-36 Doe v. Niagara Falls City Sch. Dist.*, 182 N.Y.S.3d 850, 851 (N.Y. App. Div. 2023) (holding that "it is well settled that a claim-revival statute will satisfy the Due Process Clause of the [New York] State Constitution if it was enacted as a reasonable response in order to remedy an injustice" (quotation marks omitted); *S.Y. v. Roman Cath. Diocese of Paterson*, No. 20-CV-02605, 2021 WL 4473153, at *5-8 (D.N.J. Sept. 30, 2021) (rejecting objection to claim-revival

---

[69]  *Sliney* concluded that the legislative purpose, which included "enabling [victims of childhood sexual abuse] to seek a remedy for severe injuries they did not appreciate for long periods of time," was sound.  41 N.E.3d at 739.

statute on the basis that it "retroactively revived claims that have for decades been indisputably barred," upset "settled expectations," and "anticipated continuance of the present general laws," and holding there was no violation of due process under the state's constitution because "without more, that is precisely the type of expectation that the New Jersey courts have repeatedly held insufficient to invalidate otherwise legitimate legislation" on due process grounds (quotation marks omitted)).[70]

[¶149] In testing whether section 752-C(3) violates due process under article I, section 6-A of our Constitution, therefore, I would employ the test set out in *L.V.I.*, as modified to reflect the approach taken by the Massachusetts Supreme Judicial Court in *Sliney*, which I find fitting for the particular circumstances presented here. For the following reasons, I conclude that retrospective application of the statute does not violate due process.

[¶150] First, section 752-C(3)'s object clearly meets the first requirement of *L.V.I.* to "provide for the public welfare." 1997 ME 25, ¶ 9, 690 A.2d 960 (quotation marks omitted). Its purpose is to allow individuals claiming to have been victimized as children an opportunity to seek a remedy

---

[70] Other courts have taken a similar approach by essentially adopting the federal due process standard under the Fourteenth Amendment espoused in *Campbell* and *Donaldson* as the due process standard in their respective state constitutions. *See, e.g.*, *A.B.*, 298 A.3d at 581-82; *Sheehan*, 15 A.3d at 1258-59; *Deutsch*, 80 Cal. Rptr. 3d at 380; *Cosgriffe*, 864 P.2d at 778-79.

for abuse they suffered but were unable to appreciate or come to terms with for long periods of time—until well after the applicable limitations period expired.

[¶151]  As applied here, the second and third requirements in *L.V.I.*—appropriate legislative means that are not exercised in an arbitrary or capricious manner—essentially examine whether the statute unreasonably interferes with the rights of the Bishop (or others), whether its scope is reasonable, and whether it rationally achieves its end.

[¶152]  For reasons already discussed, I reject the Bishop's argument that there is a vested, constitutionally protected right to avoid defending legal claims based on the running of the statute of limitations.  As noted above, "there is no such thing as a vested right to do wrong." *Danforth*, 59 N.E. at 1034 (quotation marks omitted)*.*  Numerous other courts, including the Supreme Court, have reached a similar conclusion under their respective constitutions.  *See, e.g.*, *A.B. v. S.U.*, 298 A.3d 573, 581 (Vt. 2023); *Sliney*, 441 N.E.2d at 739-42; *Donaldson*, 325 U.S. at 316.

[¶153]  The Bishop further claims his due process rights are implicated because the passage of time has compromised the ability to adequately defend against claims that occurred many years ago.  Granted, this is a legitimate interest that warrants consideration.  Defending against claims years (here, decades) old may involve complications—memories fade, witnesses disappear,

and records may be unavailable or difficult to recover. Plaintiffs too face similar complications. *See Jane Doe v. Missionary Oblates of Mary Immaculate E. Province*, No. 1:22-CV-00381, 2025 WL 43283 (D. Me. Jan. 7, 2025) (granting summary judgment in favor of defendants because plaintiff produced insufficient evidence to establish defendants' "aware[ness] of any priests' propensity to sexually abuse children in the 1950s"). Any such challenges in this case, however, remain speculative at this juncture. And the Bishop is not precluded from raising the age of the claim in connection with any other defense available. The enactment of section 752-C(3) reflected a policy judgment made by the Legislature balancing the interests involved. Given the circumstances presented by these particular claimants, affording greater weight to their interests is not unreasonable.

[¶154] Finally, section 752-C(3) rationally achieves its end and is reasonable in scope. Although similar statutes in other states established time periods of varying duration in which claimants could assert revived claims, section 752-C(3) is open-ended and does not impose a cutoff for bringing claims. This does not portend, however, an endless stream of claims. Given the Legislature's earlier extensions of the statute of limitations in the 1980s and 1990s followed by the eventual elimination of the statute entirely twenty-four years ago, section 752-C(3)'s impact will be limited. The number of claimants,

like Dupuis and the others here, is not only limited but will diminish over time. In reality, this is no less reasonable than the lengthy periods adopted and found reasonable in other states. *See Sliney*, 441 N.E.2d at 741-42 (holding thirty-five-year open-claims window reasonable).

### III. CONCLUSION

[¶155] Before reporting this matter to us pursuant to M.R. Civ. P. 24(c), the trial court, in denying the Bishop's motion for judgment on the pleadings, concluded that the expiration of the statute of limitations applicable to the plaintiffs' claims did not confer a vested right to immunity from suit and that the Bishop did not meet the "heavy burden" to "demonstrate convincingly" that section 752-C(3) as applied conflicts with our Constitution. I agree and would answer the question before us today accordingly.

---

Gerald F. Petruccelli, Esq. (orally), Scott D. Dolan, Esq., James B. Haddow, Esq., and Michael K. Martin, Esq., Petruccelli, Martin & Haddow, LLP, Portland, for appellant Roman Catholic Bishop of Portland

Michael T. Bigos, Esq. (orally), Timothy M. Kenlan, Esq., and Joseph G.E. Gousse, Esq., Berman & Simmons, P.A., Lewiston, for appellees Robert E. Dupuis et al.

Aaron M. Frey, Attorney General, and Jason Anton, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Melissa L. Martin, Esq., Maine Coalition Against Sexual Assault, Augusta; Lucia Chomeau Hunt, Esq., Pine Tree Legal Assistance, Inc., Portland; and Marci A. Hamilton, Esq., Child USA, Philadelphia, Pennsylvania, for amici curiae Child

USA, Maine Coalition Against Sexual Assault, and Pine Tree Legal Assistance, Inc.

Jesse E. Weisshaar, Esq., and Cary Silverman, Esq., Shook, Hardy & Bacon L.L.P., Washington, D.C., for amici curiae American Tort Reform Association and American Property Casualty Insurance Association

Shelby Leighton, Esq., Public Justice, Washington, D.C., and Thomas L. Douglas, Esq., Douglas, McDaniel & Campo, LLC, PA, North Yarmouth, for amici curiae Maine Trial Lawyers Association, Public Justice, and American Association for Justice

Business and Consumer Docket docket numbers CIV-2022-44, CIV-2022-48, CIV-2022-49, CIV-2022-60, CIV-2022-61, CIV-2022-62, CIV-2022-63, CIV-2022-64, CIV-2022-65, CIV-2022-66, CIV-2022-67, CIV-2022-68, and CIV-2022-69
For Clerk Reference Only